# In the United States Court of Federal Claims

**No. 23-528C**
**Filed: January 21, 2024**

**Redacted Version Issued for Publication: February 29, 2024[1]**

```
* * * * * * * * * * * * * * * * *
                                  *
THALLE CONSTRUCTION CO., INC.,    *
                                  *
                                  *
           Protestor,             *
                                  *
v.                                *
                                  *
UNITED STATES,                    *
                                  *
           Defendant,             *
                                  *
                                  *
v.                                *
                                  *
FORGEN-ODIN JV,                   *
                                  *
           Defendant-Intervenor.  *
                                  *
* * * * * * * * * * * * * * * * *
```

**Jacob W. Scott**, Smith, Currie & Hancock LLP, Tysons, Va. for protestor. With him were **Alexander Gorelik**, Smith, Currie & Hancock LLP, Tysons, Va.; **Lochlin B. Samples**, Smith, Currie & Hancock LLP, Atlanta, Ga., of counsel.

**Joshua E. Kurland,** Department of Justice, Washington, DC, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant. With him were **Deborah A. Bynum**, Assistant Director, Commercial Litigation Branch, **Patricia M. McCarthy**, Director, Commercial Litigation Branch, and **Brian M. Boynton**, Principal Deputy Assistant Attorney General, Civil Division. Of counsel was **Michael T. Geiselhart**, Assistant District Counsel, U.S. Army Corps of Engineers, Jacksonville District.

**Casey J. McKinnon,** Cohen Seglias Pallas Greenhall & Furman PC, Washington, DC, for intervenor. With him was **Michael H. Payne**, Cohen Seglias Pallas Greenhall & Furman PC, Philadelphia, Pa., of counsel.

---

[1] This Opinion was issued under seal on January 21, 2024. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with the some of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

# O P I N I O N

**HORN, J.**

Protestor, Thalle Construction Co., Inc. (Thalle), filed the above captioned post-award bid protest in the United States Court of Federal Claims challenging the decision of the United States Army Corps of Engineers to award a contract to the intervenor "Forgen-Odin JV."[2] Given the requirements of the parties, the court previously issued an oral decision to the parties in the above captioned bid protest. This Opinion memorializes the oral decision provided to the parties.

## FINDINGS OF FACT

On June 10, 2022, the Army Corps of Engineers issued Solicitation No. W912EP-22-R-0005 (the RFP) for the "Central Everglades Planning Project (CEPP) Contract 11A, Everglades Agricultural Area (EM) A-2 Reservoir Foundation & Cutoff Wall Project, Palm Beach County, Florida." The RFP[3] explained the scope of work for the project involved the:

> Clearing, grubbing, de-mucking, blasting, foundation preparation, installation of a seepage cutoff wall, canal backfilling, and all incidental related work to prepare approximately 15.3 miles of foundation for a 17.3 miles-long embankment dam, to be constructed under separate contract within the Everglades Agricultural Area (EAA). The approximate toe to toe width of the foundation is 260 feet in the north, east, and west; and 235 feet

---

[2] According to the intervenor's proposal, the joint venture of intervenor Forgen-Odin JV is comprised of Forgen, LLC and Odin Construction Solutions, LLC. The Joint Venture Agreement, included in the Administrative Record, begins:

> This Master Joint Venture Agreement ("Agreement") is made and entered into this 24th day of February, 2022, by and between **Forgen, LLC ("Forgen") with its principal office and place of business at 6558 Lonetree Blvd. Rocklin, CA 95765** and **Odin Construction Solutions, LLC ("ODIN"), with its principal office and place of business at 4740 Rocklin Road, Rocklin, CA 95677.**

(capitalization and emphasis in original). In both its initial proposal and its revised proposal to the Army Corps of Engineers, intervenor mistakenly states Forgen-Odin JV consists of Forgen, LLC and Odin Construction Solutions, Inc. Intervenor caused further confusion by including references to Odin Construction Solutions, Inc. in its Past Performance, banking references and Small Business Subcontracting Plan in both its initial and revised proposals to the Army Corps of Engineers. At the oral argument, intervenor's counsel of record explained that "Odin Construction Solutions, Inc. was converted to Odin Construction Solutions, LLC, on December 8th, 2021."

[3] Unless otherwise specified, the following provisions of the RFP are all under RFP Section 00100A, Proposal Evaluation & Submission Instructions.

> in the south. Dewatering will be required to control the groundwater and conduct work in the dry in accordance with contract specifications. All lands for this project are owned by the South Florida Water Management District (SFWMD) and provided to the USACE [United States Army Corps of Engineers] for construction of these project features.

(alteration added). The RFP explained that the award would be "made based on the best overall (i.e., best value) proposal that is determined to be the most beneficial to the Government, with appropriate consideration given to the four evaluation factors," listing the first three factors in descending order of importance, and price:

**Factor 1 – Technical Merit**

**Factor 2 – Past Performance**

**Factor 3 – Small Business Participation**

**Factor 4 – Price**

(capitalization and emphasis in original). The RFP further stated "[t]he Source Selection Authority (SSA) will use a trade-off process to determine which offer represents the best value to the Government." (alteration added). The RFP explained the trade-off process allows the Army Corps of Engineers "to consider making award to other than the lowest priced offeror or other than the highest technically rated offeror." The RFP continued:

> To receive consideration for award, a rating of no less than "Acceptable" must be achieved for the Technical Merit Factor and the Small Business Participation Factor, and a rating of no less than "Neutral Confidence" must be achieved for the Past Performance Factor. A rating of "Unacceptable" for the Technical Merit Factor or Small Business Participation Factor will result in an unawardable proposal. Offerors are cautioned that the award may not necessarily be made to the lowest price offeror or the highest technically rated offeror.

Under the heading "**Evaluation Approach**," the RFP explained timely submitted proposals will be evaluated "on the basis of the factors stated in the solicitation to select the responsible offeror whose proposal is most advantageous to the Government." (emphasis in original). The RFP warned offerors that "[p]roposals without the specified content may be determined Unacceptable and removed from the competition." (alteration added). The RFP also stated "[t]he Government will not make assumptions concerning intent, capabilities, or experiences." (alteration added). The RFP explained, under the heading, "**Proposal Evaluation**:"

> The Government intends to evaluate proposals and award a contract without discussions with offerors. Therefore, the offeror's initial proposal should contain the offeror's best terms from a price and technical standpoint. The Government may conduct discussions if the SSA [Source Selection Authority] later determines them to be necessary. Further, if the SSA determines that discussions are necessary and if the SSA determines that the number of proposals that would otherwise be in the competitive

> range exceeds the number at which an efficient competition can be conducted, the SSA may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals.

(capitalization and emphasis in original; alteration added). Under the heading, "**Source Selection Decision**," the RFP explained:

> The SSA, independently exercising prudent business judgment, will make the source selection decision based on the proposal that represents the best value to the Government. The SSA will evaluate all proposals in accordance with the factors stated in the solicitation to select the responsible offeror whose proposal is most advantageous to the Government. The SSA will receive a comparative analysis and recommendation from a Source Selection Advisory Council (SSAC) as to which proposal represents the best value to the Government.

(capitalization and emphasis in original). The RFP also stated that all joint venture offerors must "provide a signed copy of the joint venture agreement with the initial proposal." The RFP further required joint venture offerors to be "registered in the System for Award Management website (SAM.gov) as a joint venture at time of proposal submission."

> For Factor 1 – Technical Merit, the RFP stated:

> In accordance with the Limitations on Substitutions or Certain Items of Work, Positions and/or Subcontractors paragraph in Section 00800 of this solicitation, a letter of commitment must be provided as established under "Construction Sequence and Turnover Plan" for any proposed major subcontractor for the following: cutoff wall construction, surface and subsurface water management, placement of Controlled Low Strength Material (CLSM), and blasting. If any of that work is intended to be self-performed, it should be stated in the proposal.

The RFP defined a letter of commitment as

> a letter from a major subcontractor on official company letterhead addressed to the offeror as prime contractor, identifying the work the subcontractor intends to perform, and stating that the subcontractor is willing to be bound to perform the identified work if the offeror is awarded a contract. A letter of commitment simply stating that a major subcontractor commits to submit pricing to the offeror does not satisfy this requirement.

The RFP further stated "[f]ailure to provide a letter of commitment from any proposed major subcontractor(s) will be noted as a deficiency. Submission of multiple letters of commitment from proposed major subcontractor for the same portion/items of work or position may be noted as a weakness." (alteration added).

The RFP required offerors to submit letters of commitment from "major subcontractors," which the RFP defined as "any subcontractor whose experience is submitted as part of this proposal and is also identified in the non-substitution clause in

Section 00800 of the solicitation." In Section 00800 of the RFP, under the heading, "**LIMITATIONS ON SUBSTITUTIONS OR CERTAIN ITEMS OF WORK, POSITIONS AND/OR SUBCONTRACTORS,**" (emphasis and capitalization in original), the RFP stated:

> ~~The award decision for this contract was based, in part, on an evaluation of the personnel and/or subcontractors the Contractor included in its proposal for the positions and/or items of subcontracted work identified at the end of this paragraph.~~ The Offeror agrees these key personnel and/or subcontractors will be employed as described in its proposal and no substitutes will be employed without prior written approval of the Contracting Officer or Administrative Contracting Officer. The Offeror further agrees that any proposed substitutes shall meet or exceed the qualifications of the original key personnel and/or subcontractors. If the Offeror's proposal did not name a subcontractor for an identified item of work, the Offeror will not be allowed to subcontract that item of work without prior approval of the Contracting Officer or Administrative Contracting Officer.

(strikethrough in original).[4] The RFP further stated:

> Key Personnel subject to Limitations On Substitutions For Certain Positions And/Or Subcontractors:
>
> - ~~Offeror's~~ Project Manager
> - Construction Quality Control Manager
> - Site Superintendent
> - Site Safety and Health Officer (SSHO)
>
> Subcontract work subject to Limitations On Substitutions For Certain Positions And/Or Subcontractors:
>
> - Cutoff wall construction
> - Surface and subsurface water management (This could be a dewatering sub)
> - Placement of Controlled Low Strength Material (CLSM)
> - Blasting

(capitalization and strikethrough in original).

Separately, the RFP required offerors to submit a "Construction Sequence and Turnover Plan" and "Construction Schedule" for Factor 1 – Technical Merit. For the "**Construction Sequence and Turnover Plan**," the RFP stated:

---

[4] On June 12, 2019, the Agency issued Amendment #A001 to the RFP. The above quoted language is struck through as it appears in Amendment 001 of the RFP and as submitted to the court as part of the Administrative Record. On July 8, 2022 and July 18, 2022, the Agency issued Amendment #A002 and Amendment #A003, respectively. The changes in Amendment #A002 and Amendment #A003 do not impact the court's analysis.

In a narrative format, the offeror must describe in detail the proposed Construction Sequence and Turnover Plan regarding how the offeror intends to approach, sequence, and execute the work from start to completion. The plan must include a description of related activities and include coordination with major subcontractors, types of equipment to be utilized and any other means and methods the offeror feels will give the Government confidence the offeror understands and will successfully complete the project.

At a minimum the Construction Sequence and Turnover Plan must:

1. Outline and illustrate the approach, sequence, and timing of activities that represent work through the entire project from mobilization to demobilization, to include the means and methods for turning over sections (Inclusive of Preliminary Foundation Preparation, Rock Foundation and Geologic Mapping, Final Foundation Preparation, Controlled Low Strength Material (CLSM), CLSM Top Cover, and Cutoff Wall (including Verification Drilling/Testing)) of completed foundation that can be removed from the construction footprint and turned over to the Government in no less than 500-foot segments that meet requirements of sections 01 45 08 and 01 78 02 of the solicitation.

2. Provide a list of equipment (type, model number, and quantity) planned to be utilized to prepare the dam foundation and construct the cutoff wall as specified in sections 02 35 29, 31 23 24, and 31 66 10 of the solicitation.

3. Include a conceptual/draft Rock Foundation Preparation Plan as specified in Section 31 66 10 of the solicitation.

4. Provide discussion of the means and methods of cutoff wall construction and trench excavation through rock, as well as the means and methods of cutoff wall backfill preparation, transport, placement, and slurry management as specified in section 02 35 29.

5. Provide a concept/draft of the proposed plan to manage surface and subsurface water within the limits of construction and/or off-site to include a description of all necessary permits as specified in section 01 57 20 and following all requirements specified in section 31 52 10 of the solicitation.

6. Explain in detail how the offeror will manage access to the site, stockpile areas, and traffic within project access and haul roads to allow for construction and unobstructed access throughout the duration of the project. Include detail for coordination and cooperation with other contractors working near the limits of construction.

7. Provide a detailed explanation of how the offeror will ensure quality control including a description of proposed quality control measures such as materials testing, data management, material management, surveying, etc., as required in section 01 45 04 and section 01 45 08 of the solicitation.

Additional consideration may be given for the Construction Sequence and Turnover Plan that:

8. Describes in detail the external influences on the construction area with respect to items such as groundwater elevation, dewatering, effluent discharge.

9. Includes the work production rate(s) anticipated to maintain the construction schedule, and the means for monitoring the production rate(s).

(emphasis in original). For the Construction Schedule, the RFP stated offerors must:

Provide a schedule of construction within the period of performance provided in Section 00700, FAR Clause 52.211-10, in the formant [sic] of a Gantt, Pert, or similar graphical timeline, showing the start and completion dates, interdependence, and other relative scheduling factors for all the items of work contained within the proposed Construction Sequence and Turnover Plan.

At a minimum, the construction schedule must show the interdependence of activities (i.e., schedule logic) and start and completion dates for the following:

1. Mobilization and Demobilization of all work items

2. Critical path activities

3. Clearing and grubbing within the construction footprint (including staging, stockpiling, and borrow areas where required)

4. Surface and Subsurface Water Management system(s)

5. Rock Foundation preparation demonstration section

6. Rock Foundation preparation

    a.   Preliminary   Foundation   Preparation   (including   de-mucking/removal of overburden)

    b. Rock Foundation Inspection and Mapping

    c. Final Foundation Preparation

    d. CLSM Dental Treatment

7. Cutoff Wall demonstration section

8. Cutoff Wall construction, to include pretreatment of rock

9. Submittals and Permits

10. Contingency time (e.g., float)

11. Start and End of Project activities

(capitalization in original; alteration added).

The RFP provided that the failure of an offeror to submit any of the minimum requirements for the Construction Sequence and Turnover Plan or for the Construction Schedule will be noted as a deficiency, and failure to provide "clear and comprehensive detail to any of the minimum requirements" for the Construction Sequence and Turnover Plan or the Construction Schedule "may be noted as a significant weakness or weakness."

Under the heading "**Evaluation Method**," the RFP explained:

The Government will evaluate the Construction Sequence and Turnover Plan, and the Construction Schedule to determine the degree to which the offeror's proposal meets the requirements of the solicitation as well as the feasibility of the proposed approach. The feasibility of the proposed Construction Sequence and Turnover Plan and Construction Schedule will measure how well the means and methods proposed provide the Government with confidence of the offerors understanding of the project and potential for successful project completion in accordance with the solicitation requirements and within the required contract schedule. The Construction Schedule must be corroborated by the Construction Sequence and Turnover Plan.

The Construction Sequence and Turnover Plan evaluation determines the level of understanding of how the offeror intends to approach, sequence, and execute the work from start to completion. Narratives that demonstrate a clear understanding and provide a thorough approach for successfully managing the solicited project that gives the government a higher level of confidence may be rated more favorably by the Government.

The Construction Schedule evaluation determines the degree to which the offeror's proposal meets the requirements of the solicitation as well as the feasibility of the proposed approach. The offeror's schedule narrative should be expressed in calendar days, not dates.

The evaluation will include whether the offeror has demonstrated a reasonable understanding of the Construction Schedule. A Construction Schedule shorter than the contract duration of 2044 calendar days indicates the offeror is placing additional risk on the Government for any delays between the scheduled completion date and the required contract completion period. The Government will consider a condensed contract duration, which places additional cost or schedule risk on the Government, or which may create a risk of contract or performance failure as "unacceptable".

The overall rating for Factor 1 will consider how well the Construction Sequence and Turnover Plan, and the Construction Schedule support one another. Submission of no more than the minimum requirements for the Construction Sequence and Turnover Plan, and the Construction Schedule

may receive no higher than an Acceptable rating for Factor 1. Any conflict between the Construction Sequence and Turnover Plan and Construction Schedule may be noted as a significant weakness or weakness.

After listing proposal strengths, weaknesses, significant weaknesses, and deficiencies, the Government will assign an adjective rating of "Outstanding", "Good", "Acceptable", "Marginal", or "Unacceptable" for this factor to reflect the Government's confidence in each offeror's technical ability, as demonstrated in its proposal, to perform the requirements stated in the solicitation. An adjectival rating shall be assigned, using the Technical Evaluation Ratings, which incorporate a proposal risk assessment.

(capitalization and emphasis in original).

For Factor 1 – Technical Merit's "**TECHNICAL EVALUATION RATING SYSTEM**," the RFP stated:

Each member of the Source Selection Evaluation Board (SSEB) will individually rate each proposal against the specified evaluation criteria in the Solicitation. The SSEB will reach consensus on the final rating assigned to ensure that it reflects the degree to which the proposal meets or does not meet the minimum requirements through an assessment of the strengths, weaknesses, deficiencies, and risks of a proposal and provide findings in writing to the SSAC, which will conduct a comparative analysis and provide a recommendation to the SSA. The SSA will evaluate all proposals in accordance with the factors stated in the solicitation to select the responsible offeror whose proposal is most advantageous to the Government.

(capitalization and emphasis in original). The RFP continued "[a]fter listing proposal strengths, weaknesses and deficiencies, the SSEB will assign an adjective rating of 'Outstanding,' 'Good,' 'Acceptable,' 'Marginal,' or 'Unacceptable' to each factor to reflect the Government's confidence in each offeror's technical ability, as demonstrated in its proposal, to perform the requirements stated in the solicitation." (alteration added). The RFP identified the following adjective technical merit ratings:

**Deficiency** - A material failure of a proposal to meet a government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.

**Weakness** - A flaw in the proposal that increases the risk of unsuccessful contract performance.

**Significant Weakness** - A flaw in the proposal that appreciably increases the risk of unsuccessful contract performance.

**Strength** - Any an [sic] aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance.

**Deviation** - Proposal implies or specifically offers a deviation below the specified criteria. The offeror may or may not have called the deviation to the Government's attention. A deviation is a deficiency. The proposal must conform to the solicitation requirements for award.

**Combined Technical/Risk Rating** - The offeror's technical solution will consist of a combined rating. The combined technical/risk rating includes consideration of risk in conjunction with the strengths, weaknesses, significant weaknesses, uncertainties, and deficiencies in determining technical ratings. (See Combined Technical/Risk Rating Method below).

Combined Technical/Risk Rating Method

| Color Rating | Adjectival Rating | Description |
|---|---|---|
| Blue | Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| Purple | Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is unawardable. |

(capitalization and emphasis in original; alteration added).

For Factor 2 – Past Performance, the RFP required offerors to "provide a minimum of three, not to exceed five examples of completed projects." For Factor 3 – Small Business Participation, the RFP required offerors to complete and submit a Proposed Small Business Participation Plan and to

> identify the extent to which Small Businesses (SBs), Veteran-Owned Small Businesses (VOSBs), Service-Disabled Veteran-Owned Small Businesses (SDVOSBs), HUBZone Small Businesses, Small Disadvantaged Businesses (SDBs), and Woman-Owned Small Businesses (WOSBs) will be utilized in the performance of this contract.

For Factor 4 - Price, the RFP explained price is not rated but is "evaluated for reasonableness." The RFP further stated "[a]ll evaluation factors other than price, when combined, are significantly more important than price." (alteration added). The RFP advised offerors "that their business decision to submit a low-priced proposal can be considered in assessing their understanding or the risk associated with their proposal."

Initial Proposals

In response to the RFP, on July 28, 2022, three offerors timely submitted proposals on July 28, 2022. The three offerors were: protestor Thalle, intervenor Forgen-Odin JV, and Kiewit-Phillips and Jordan JV (Kiewit-Phillips JV). On August 8, 2022, the Army Corps of Engineers issued a revised Independent Government Cost Estimate. On August 12, 2022, the Army Corps of Engineers conducted a Technical Price Analysis, Past Performance Proposal Evaluation, and Small Business Proposal Evaluation for each of the offerors' proposals. The court notes the memoranda containing the Technical Price Analysis for the offerors' proposal are dated August 11, 2022, and are digitally signed by Ke'Andra West, Civil Engineer, Cost Engineering Section, Technical Services Branch on August 12, 2022. The Past Performance Proposal Evaluation does not contain a digital signature. The Small Business Proposal Evaluation Worksheet for Forgen-Odin JV contains evaluator initials dated July 6, 2022. The Small Business Proposal Evaluation Worksheet for Kiewit-Phillips JV contains evaluator initials dated July 7, 2022. Finally, the Small Business Proposal Evaluation Worksheet for Thalle contains evaluator initials dated August 4, 2022 for Thalle's initial proposal Also on August 12, 2022, the Source Selection Evaluation Board issued its initial report on the offerors' proposals. The Source Selection Evaluation Board's initial evaluation found deficiencies for the Forgen-Odin JV's and Kiewit-Phillips JV's proposals resulting in "Unacceptable" ratings for Factor 1 – Technical Merit and rendering both initial proposals unawardable. The Army Corps of Engineers' evaluation of the offerors' initial proposals, as well as the Independent Government Cost Estimate, is provided in the table below.

**Table 2: Initial Proposal  Evaluation Results and IGE**

| FACTORS | Forgen-Odin JV (F-O JV) | Kiewit-Phillips and Jordan JV (K-P & J JV) | Thalle Construction Co., Inc. (Thalle) |
|---|---|---|---|
| | | | |
| Factor 1 - Technical Merit | Unacceptable | Unacceptable | Acceptable |
| | | | |
| Factor 2 - Past Performance | Relevant  Substantial Confidence | Relevant  Substantial Confidence | Relevant  Substantial Confidence |
| | | | |
| Factor 3 - Small Business Participation | Acceptable | Acceptable | Marginal |
| | | | |
| Factor 4 - Price | $492,335,680.00 | $[redacted] | $[redacted] |
| Revised IGE | $[redacted] | $[redacted] | $[redacted] |
| Revised IGE + 25% | $[redacted] | $[redacted] | $[redacted] |

Separate from the Source Selection Evaluation Board's evaluations, in an August 12, 2022 Competitive Range Determination, the Source Selection Authority and Contracting Officer, Mr. James Tracy, determined it was in the best interest of the government to allow all the offerors to submit revised proposals and open further discussions.[5] The Source Selection Authority and Contracting Officer Tracy also issued a Pre-negotiation Objective Memorandum on August 12, 2022, which stated, in part:

> In accordance with FAR 15.306(d)(3), discussions will be open with all offerors within the Competitive Range to allow for proposal revisions, address weaknesses, significant weaknesses, or deficiencies, any potential past performance issues, as well as pricing questions identified in the Price Analysis. After evaluation of each offeror's response to discussion letters, the Government will determine which offeror's proposal provided the best value to the Government for award.

On the same day, August 12, 2022, the Army Corps of Engineers issued discussions letters to each of the offerors, in which the Army Corps of Engineers identified areas in the initial proposals that contained a Weakness, Significant Weakness, Deficiency, or an area of the proposal that was deemed Marginal or Unacceptable. In the discussions letter with Forgen-Odin JV for Factor 1 – Technical Merit, Contracting Officer Tracy indicated, in part:

> Weaknesses:
>
> - No major sub-contractor is identified for the work effort of surface and subsurface water management. Since no major sub-contractor is identified, it appears that the work will be self-performed, but there is no clear statement of offeror's intent to self-perform this feature of work.
> - Major sub-contractor Terrell Materials Corporation provides the batch plant and materials to produce the CLSM [Controlled Low

---

[5] As indicated above, the RFP explained, under the heading, "**Proposal Evaluation**:"

> The Government intends to evaluate proposals and award a contract without discussions with offerors. Therefore, the offeror's initial proposal should contain the offeror's best terms from a price and technical standpoint. The Government may conduct discussions if the SSA later determines them to be necessary. Further, if the SSA determines that discussions are necessary and if the SSA determines that the number of proposals that would otherwise be in the competitive range exceeds the number at which an efficient competition can be conducted, the SSA may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals.

(capitalization and emphasis in original).

Strength Material] material, but the proposal does not state whether placement of CLSM will be self-performed or whether placement of CLSM will be completed by a major subcontractor.

- The proposal's critical path schedule has activities preceding second Notice to Proceed being issued. The schedule assumes second Notice to Proceed being issued 31 January 2023. The schedule also has site preparation starting on 11 January 2023 and Initial Site Fence Installation and Establish Initial Site Access Roads starting on 26 January 2023. The proposed start of these activities ahead of the second notice to proceed is not allowed by the specifications. Information is contained on pages 1-2 of the schedule on pages 231-232 in Volume 1, Factor 1.

- Turnover Milestones on schedule generally indicate a large amount of total float days. Punchout Inspection, Pre-final inspection, and Final inspection activities are not shown on each Acceptance Section which could extend the actual acceptance dates. Per Specification Section 01 11 00, Para 1.2.5 "the Government intends to request sections of completed work be submitted for acceptance by the Government in not less than 500 linear foot sections. As Acceptance Sections are complete, the Contractor must immediately submit the documentation required of Section 01 45 08 DATA MANAGEMENT AND DATA REQUIREMENTS and Section 01 78 02 CLOSEOUT SUBMITTALS. Following approval, the completed Acceptance Sections will be removed from the Contractor's limits of construction as the Government will be turning these sections over to a future construction contract for embankment construction.

Deficiencies:

- The proposal failed to meet the construction schedule duration of 2044 calendar days. The schedule provided is 2010 calendar days. The solicitation stated that a Construction Schedule duration shorter than the contract duration of 2044 calendar days indicates the offeror is placing additional risk on the Government for any delays between the scheduled completion date and the required contract completion period. The Government will consider a condensed contract duration, which places additional cost or schedule risk on the Government, or which may create a risk of contract or performance failure as "unacceptable". Information is contained in the construction schedule starting on page 231 of Volume 1, Factor 1.

- The proposal states in Section 1.9, "The full-scale operation will continue until 10,000 LF [Linear Feet] of CLSM top cover is reached. At that point, we will halt the Project preparation effort and await Government approval of the Demonstration Section." This is not allowed by the specifications since the Government must approve 500 LF test section prior to moving forward. The solicitation

information indicated that deviations from the plans and specifications would be labeled as deficiencies.

Based on the above deficiencies, Factor 1 – Technical Merit, has been deemed "Unacceptable".

(capitalization in original; alterations added).

<u>Revised Proposals</u>

Protestor timely submitted its revised proposal on August 17, 2022, and intervenor and Kiewit-Phillips JV timely submitted their revised proposals on August 18, 2022, following discussions with the Army Corps of Engineers.[6] The revised proposal from intervenor contained revisions to Factor 1 – Technical Merit and Factor 4 – Price. In both its initial and revised proposals, intervenor included four letters of commitment from the subcontractors it planned to use for the project. Three of the letters of commitment were addressed to "Forgen-Odin JV." The fourth letter of commitment was from Terrell Materials Corporation (Terrell) and was addressed to "Odin Construction, LLC" (alteration added). The Terrell commitment letter stated:

TO: Odin Construction, LLC.
4740 Rocklin Road
Rocklin, CA 95677

SUBJECT: Letter of Commitment for Proposed Contract for Central Everglades Planning Project (CEPP) Contract 11A, EAA A-2 Reservoir Foundation and Cutoff Wall, Palm Beach County, Florida, Solicitation No. W912EP22R0005

Dear Sir or Madam:

I hereby make the unequivocal commitment that, in the event of an award of a contract to Odin Construction, LLC, that (Terrell Materials Corporation) will fulfill the duties of (Controlled Low Strength Material Manufacturer (CLSM Manufacturer).

(capitalization in original).

As indicated above, in the August 12, 2022 discussions letter sent to Forgen-Odin JV, the Army Corps of Engineers requested clarification regarding whether Terrell would perform the placement of Controlled Low Strength Material. In Forgen-Odin JV's revised proposal, Forgen-Odin JV clarified:

---

[6] Protestor's revised proposal and Kiewit-Phillips JV's revised proposal are not at issue in this protest. Therefore, only intervenor Forgen-Odin JV's revised proposal is addressed below.

The Forgen/Odin JV's wholistic approach to the Dental Treatment/CLSM Placement involves the talents of specialty subcontractors as well as our own self-perform resources. We intend to subcontract with Florida Energy Services, Inc. (FESI) for drilling and blasting in the borrow areas. FESI is a small business that has over a 40 year successful track record performing drilling and blasting, particularly below the water table, in Florida. **The Forgen/Odin JV will then self-perform the crushing and screening operation to manufacture the fine aggregates for the CLSM as further described in Section 10 of the proposal.** We intend to enlist Terrell Materials Corporation to both batch the CLSM as well as to haul the material to the point of placement. The batching will be done via a portable central mix batch plant as described in this section of the proposal. Terrell Materials is a DBE with a successful 15 year track record in the concrete batching industry. **The Forgen/Odin JV will self-perform the placement of CLSM as described in detail in Section 3.5.2 below with our own self-perform resources**.

(capitalization and emphasis in original). Forgen-Odin JV also responded to the deficiencies Contracting Officer Tracy noted in the agency's discussions letter. Regarding Forgen-Odin JV's Construction Schedule, Forgen-Odin JV indicated: "We adjusted the number of calendar days between NTP [Notice to Proceed] 1 and Final Completion to be equal to 2,044 calendar days." (alteration added). The revised Construction Schedule included in Forgen-Odin JV's revised proposal lists the "First Notice to Proceed" as November 2, 2022 and lists the "Final Completion" to end on June 7, 2028, equaling 2,044 calendar days.

The Army Corps of Engineers' Cost Estimator conducted a Revised Price Analysis for each of the offerors' revised proposals on August 22, 2022. The three offerors did not submit revisions to Factor 2 – Past Performance, and the Army Corps of Engineers did not issue a revised Past Performance Proposal Evaluation. Forgen-Odin JV and Kiewit-Phillips JV also did not submit revisions for Factor 3 – Small Business Participation, but Thalle included revisions to Factor 3 – Small Business Participation to its revised proposal.

The Source Selection Evaluation Board reconvened on August 19, 2022 to review, and evaluate, the revised proposals and issued its revised report for Factor 1 - Technical Merit, Factor 2 – Past Performance, and Factor 3 – Small Business Participation. The Source Selection Evaluation Board evaluated the revised proposals which it summarized in the table below:

**Table 3: Revised Evaluation Results**

| FACTORS | Forgen-Odin JV (F-O JV) | Kiewit-Phillips and Jordan JV (K-P & J JV) | Thalle Construction Co., Inc. (Thalle) |
|---|---|---|---|
| | | | |
| Factor 1 - Technical Merit | Outstanding | Outstanding | Good |
| | | | |
| Factor 2 - Past Performance | Relevant<br><br>Substantial Confidence | Relevant<br><br>Substantial Confidence | Relevant<br><br>Substantial Confidence |
| | | | |
| Factor 3 - Small Business Participation | Acceptable | Acceptable | Acceptable |
| | | | |
| Factor 4 - Price | $492,335,680.00 | $[redacted] | $[redacted] |
| Revised IGE | $[redacted] | $[redacted] | $[redacted] |
| Revised IGE + 25% | $[redacted] | $[redacted] | $[redacted] |

The Source Selection Evaluation Board stated in its Source Selection Evaluation Board Revised Report for Forgen-Odin JV's revised proposal:

**FACTOR 1 – TECHNICAL MERIT – REVISED PROPOSAL**

Strengths:

The initial proposal strengths remained unchanged after an evaluation of the revised proposal. The write-up provided by the offeror indicates an exceptional approach and understanding of the requirements in the strengths provided. The information provided in the above strengths shows the risk of unsuccessful performance is low.

Weaknesses:

**The offeror resolved all weaknesses.**

• No major sub-contractor is identified for the work effort of surface and subsurface water management. Since no major sub-contractor is identified, it appears that the work will be self-performed, but there is no clear statement of offeror's intent to self-perform this feature of work (Letter of Commitment requirement stated in Factor 1). **This weakness was resolved in Section 5.1 on page 41 of the revised Volume 1, Factor 1 proposal to show self-performance.**

- Major sub-contractor Terrell Materials Corporation provides the batch plant and materials to produce the CLSM material, but the proposal does not state whether placement of CLSM will be self-performed or whether placement of CLSM will be completed by a major subcontractor (Letter of Commitment requirement stated in Factor 1). **This weakness was resolved in Section 3.5.1 on page 32 of the revised Volume 1, Factor 1 proposal to show self-performance.**

- Offeror's critical path schedule has activities proceeding second Notice to Proceed being issued. The schedule assumes second Notice to Proceed being issued 31 January 2023. The schedule also has site preparation starting on 11 January 2023 and Initial Site Fence Installation and Establish Initial Site Access Roads starting on 26 January 2023. The proposed start of these activities ahead of the second notice to proceed is not allowed by the specifications. Information is contained on pages 1-2 of the schedule on pages 231-232 in Volume 1 Factor 1 (Construction Schedule failure to provide clear and comprehensive detail to minimum requirements). **This weakness was resolved with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal.**

- Turnover Milestones on schedule generally indicate a large amount of total float days. Punchout Inspection, Pre-final inspection, and Final inspection activities are not shown on each Acceptance Section which could extend the actual acceptance dates. Per Specification Section 01 11 00, Para 1.2.5 "the Government intends to request sections of completed work be submitted for acceptance by the Government in not less than 500 linear foot sections. As Acceptance Sections are complete, the Contractor must immediately submit the documentation required of Section 01 45 08 DATA MANAGEMENT AND DATA REQUIREMENTS and Section 01 78 02 CLOSEOUT SUBMITTALS. Following approval, the completed Acceptance Sections will be removed from the Contractor's limits of construction as the Government will be turning these sections over to a future construction contract for embankment construction (Construction Schedule failure to provide clear and comprehensive detail to minimum requirements). **This weakness was fixed with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal.**

Deficiencies:

**The offeror resolved all deficiencies.**

- The offeror failed to meet the construction schedule duration of 2044 calendar days. The schedule provided is 2010 calendar days. The solicitation stated that a Construction Schedule duration shorter than the contract duration of 2044 calendar days indicates the offeror is placing additional risk on the Government for any delays between the scheduled completion date and the required contract completion period. The

Government will consider a condensed contract duration, which places additional cost or schedule risk on the Government, or which may create a risk of contract or performance failure as "unacceptable". Information is contained in the construction schedule starting on page 231 of Volume One (4th Paragraph under Evaluation Method of Construction Schedule indicates that a Construction Schedule duration shorter than the contract duration of 2044 days will be [sic] result in an overall rating of "unacceptable"). **This deficiency was resolved with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal.**

- Offeror states (Section 1.9) "The full-scale operation will continue until 10,000 LF of CLSM top cover is reached. At that point, we will halt the Project preparation effort and await Government approval of the Demonstration Section." This is not allowed by the specifications since the Government must approve 500 LF test section prior to moving forward. The solicitation information indicated that deviations from the plans and specifications would be labeled as deficiencies (Technical Specification Section 01 11 00 paragraph 1.2.5 states that no work beyond the limits of the Demonstration Section can be performed until Government approval of the Demonstration Section). **This deficiency was resolved in Section 1.9 on pg. 18 of the revised Volume 1, Factor 1 proposal.**

**Summary**: In summary, the SSEB noted the offerors' revised proposal contained 13 strengths, no weaknesses, and no deficiencies. The solicitation included a total of 17 opportunities to receive additional consideration (strengths) for various items stated in the solicitation. The offeror received strengths for 13 of these items. For the items that were not noted as strengths, the SSEB team determined either that the item did not apply to the offeror's technical approach, the information provided was insufficient to determine how it would be advantageous to the Government, or the item was not addressed in the proposal. The SSEB consensus is that the revised proposal is OUTSTANDING as it indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low.

(capitalization and emphasis in original; alteration added).

On September 2, 2022, Contracting Officer Tracy sent closing discussions letters to each of the offerors stating "[t]he Government intends to proceed with award without obtaining any further information or documentation, therefore no further revisions to your proposal shall be accepted or considered." (alteration added). On September 6, 2022, Contracting Officer Tracy and Contracting Specialist Martha Sequeira issued a Responsibility Determination as to Forgen-Odin JV.

The Source Selection Advisory Council then issued the Source Selection Advisory Council Comparative Analysis Report on September 7, 2022. The Source Selection Advisory Council members signed the Comparative Analysis Report on September 12,

18

2022. The Source Selection Advisory Council reviewed the findings of the Source Selection Evaluation Board and stated, regarding Forgen-Odin JV:

**FACTOR 1 – TECHNICAL MERIT**

Strengths:

The initial proposal strengths remained unchanged after an evaluation of the revised proposal. The write-up provided by the offeror indicates an exceptional approach and understanding of the requirements in the strengths provided. The information provided in the above strengths shows the risk of unsuccessful performance is low.

Weaknesses:

**The offeror resolved all weaknesses.**

- No major sub-contractor is identified for the work effort of surface and subsurface water management. Since no major sub-contractor is identified, it appears that the work will be self-performed, but there is no clear statement of offeror's intent to self-perform this feature of work (Letter of Commitment requirement stated in Factor 1). **This weakness was resolved in Section 5.1 on page 41 of the revised Volume 1, Factor 1; the revised proposal clearly indicated self-performance of the surface and subsurface water management.**
- Major sub-contractor Terrell Materials Corporation provides the batch plant and materials to produce the CLSM material, but the proposal does not state whether placement of CLSM will be self-performed or whether placement of CLSM will be completed by a major subcontractor (Letter of Commitment requirement stated in Factor 1). **This weakness was resolved in Section 3.5.1 on page 32 of the revised Volume 1, Factor 1; the revised proposal clearly indicated self-performance of the CLSM material placement.**
- Offeror's critical path schedule has activities proceeding second Notice to Proceed being issued. The schedule assumes second Notice to Proceed being issued 31 January 2023. The schedule also has site preparation starting on 11 January 2023 and Initial Site Fence Installation and Establish Initial Site Access Roads starting on 26 January 2023. The proposed start of these activities ahead of the second notice to proceed is not allowed by the specifications. Information is contained on pages 1-2 of the schedule on pages 231-232 in Volume 1 Factor 1 (Construction Schedule failure to provide clear and comprehensive detail to minimum requirements). **This weakness was resolved with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal.**
- Turnover Milestones on schedule generally indicate a large amount of total float days. Punchout Inspection, Pre-final inspection, and Final

inspection activities are not shown on each Acceptance Section which could extend the actual acceptance dates. Per Specification Section 01 11 00, Para 1.2.5 "the Government intends to request sections of completed work be submitted for acceptance by the Government in not less than 500 linear foot sections. As Acceptance Sections are complete, the Contractor must immediately submit the documentation required of Section 01 45 08 DATA MANAGEMENT AND DATA REQUIREMENTS and Section 01 78 02 CLOSEOUT SUBMITTALS. Following approval, the completed Acceptance Sections will be removed from the Contractor's limits of construction as the Government will be turning these sections over to a future construction contract for embankment construction (Construction Schedule failure to provide clear and comprehensive detail to minimum requirements). **This weakness was fixed with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal.**

(capitalization and emphasis in original).

The Source Selection Advisory Council stated, regarding Forgen-Odin JV's previously identified deficiencies:

Deficiencies:

**The offeror resolved all deficiencies.**

- The offeror failed to meet the construction schedule duration of 2044 calendar days. The schedule provided is 2010 calendar days. The solicitation stated that a Construction Schedule duration shorter than the contract duration of 2044 calendar days indicates the offeror is placing additional risk on the Government for any delays between the scheduled completion date and the required contract completion period. The Government will consider a condensed contract duration, which places additional cost or schedule risk on the Government, or which may create a risk of contract or performance failure as "unacceptable". Information is contained in the construction schedule starting on page 231 of Volume One (4th Paragraph under Evaluation Method of Construction Schedule indicates that a Construction Schedule duration shorter than the contract duration of 2044 days will be [sic] result in an overall rating of "unacceptable"). **This deficiency was resolved with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal.**
- Offeror states (Section 1.9) "The full-scale operation will continue until 10,000 LF of CLSM top cover is reached. At that point, we will halt the Project preparation effort and await Government approval of the Demonstration Section." This is not allowed by the specifications since the Government must approve 500 LF test section prior to moving forward. The solicitation information indicated that deviations from the

plans and specifications would be labeled as deficiencies (Technical Specification Section 01 11 00 paragraph 1.2.5 states that no work beyond the limits of the Demonstration Section can be performed until Government approval of the Demonstration Section). **This deficiency was resolved in Section 1.9 on page 18 of the revised Volume 1, Factor 1 proposal.**

**Summary**: In summary, the SSEB noted the offerors' revised proposal contained 13 strengths, no weaknesses, and no deficiencies. The solicitation included a total of 17 opportunities to receive additional consideration (strengths) for various items stated in the solicitation. The offeror received strengths for 13 of these items. For the items that were not noted as strengths, the SSEB team determined either that the item did not apply to the offeror's technical approach, the information provided was insufficient to determine how it would be advantageous to the Government, or the item was not addressed in the proposal. The SSEB technical consensus for Factor 1 – Technical Merit for their FPR changed to **Outstanding**.

(emphasis in original; alteration added).

The Source Selection Advisory Council also evaluated the information Forgen-Odin JV submitted in its revised proposal regarding price, and indicated:

**FACTOR 4 – PRICE AND PRICE RELATED INFORMATION**

F-O JV's [Forgen-Odin JV] submitted a revised price proposal, dated 18 August 2022, in response to the Evaluation Notice dated 12 August 2022. A price analysis was performed by the Government's Cost Estimator, which is dated 22 August 2022. The price analysis compared the Offeror's price proposal to both the IGE and the Average of Proposals to evaluate reasonableness and balanced pricing.

The SSAC reviewed the price analysis, dated 22 August 2022, performed by the Government's Cost Estimator and concluded it is accurate, consistent and in accordance with the prescribed methodology established in the solicitation.

F-O JV's (Offeror A) revised price proposal of $308,432,100.00 + $183,903,580.00 (Base + Options 1-3), is $492,335,680.00 (Approx. [redacted]%) above the IGE of $[redacted] and within the maximum awardable range of $[redacted]. The price analysis indicated that while some line items (CLINs) were revised, the overall price remained the same. F-O JV's overall price for each of the Base and three Options remained within 125% of the IGE's corresponding price totals, and therefore, appears fair and reasonable. The price analysis did not identify any unbalanced pricing nor any items that could be unreasonably low, when compared with the IGE and the average of the price proposals. However, the price analysis

identified thirty items that could be considered unreasonably high, since the offeror's prices for these items are above 125% of both the IGE's price and the average of proposals. These items were the same items identified in the Evaluation Notice, dated 22 August 2022. As requested in the Evaluation Notice, the offeror provided in their revised proposal a written narrative to support the prices submitted for the referenced items. The price analysis reviewed the additional information provided for the items in question and results of the analysis are further discussed below.

(emphasis in original; alteration added).[7]

The Source Selection Advisory Council then conducted a Comparative Analysis on the protestor's revised proposal and the intervenor's revised proposal.[8] Regarding Factor 1 – Technical Merit, the Source Selection Advisory Council stated:

- F-O JV received an overall rating of "Outstanding" for Technical Merit while Thalle received an overall rating of "Good". Specifically, F-O JV's final revised proposal, which presented an exceptionally well-developed Construction Sequence and Turnover Plan, contains 13 strengths and zero weaknesses or deficiencies, while the Construction Schedule, which indicates the firm is able to complete the work within 2,044 calendar days from receipt of the Notice to Proceed, as required by the solicitation, is logical, detailed and correlates well with the proposed Construction Sequence and Turnover Plan. As a whole, the proposal is indicative of the firm's exceptional understanding of the work associated with the Everglades Agricultural A-2 Reservoir Foundation and Cutoff Wall and has instilled a high level of confidence in F-O JV's ability to complete said work. The proposal, which exceeds the requirements set-forth in the solicitation, demonstrates to the Government that F-O JV has the requisite experience, Construction Sequence, Turnover Plan and Construction Schedule to facility [sic] the successful completion of this project.
- Thalle's final revised proposal contains nine strengths, one weakness, which is considered significant, and no deficiencies. While nine strengths were note [sic], in most cases the strengths represent minimal coverage of the information requested in the solicitation as it relates to additional consideration. This lack of detail

---

[7] The price analysis goes on to describe contract line items (CLINs) that were submitted as part of Forgen-Odin JV's revised proposal that are not at issue in the above-captioned protest.

[8] In the Source Selection Advisory Council's Comparative Analysis, the Source Selection Advisory Council explained, with regard to Kiewit-Phillips JV, "their final revised proposal still unreasonably high, outside the maximum awardable range of $[redacted] (IGE of $[redacted] + [redacted]%), and un-awardable. Therefore, their inclusion in the below analysis is not required."

reduced the overall value of the strengths, which were largely offset by the significant weakness and the general lack of sufficient detail in the technical proposal. While rated "Good", given the definitions set-forth in the solicitation, the technical proposal does not demonstrate a thorough understanding of the requirements of the project as the schedule provides no activities related to completion, acceptance and turn-over of portions of the work during construction. Such information is an important aspect of the technical approach but was not included in the schedule. Additionally, the schedule does not provide detail of the transition from demonstration sections to the production work to show an understanding of the relationship of these activities to the overall workflow. Overall, the lack of detail in the construction schedule makes it difficult to evaluate and corroborate the feasibility of the proposed approach. As stated in the solicitation, the Construction Schedule must be corroborated by the Construction Sequence and Turnover Plan. This lack of corroboration does not provide confidence that the Offeror has a thorough understanding of the project requirements and how these requirements will impact the flow of work through the schedule and the risk of unsuccessful performance is rated as moderate.

(alterations added).

For Factor 4 – Price, the Source Selection Advisory Council stated:

- F-O JV's revised price proposal of $308,432,100.00 + $183,903,580.00 (Base + Options 1-3), is $492,335,680.00 or approximately [redacted]%) above the IGE of $[redacted] and within the maximum awardable range of $[redacted]. The price analysis indicated that while some contract line items (CLINs) were revised, the overall price remained the same. F-O JV's overall price for the Base and three Options remained within 125% of the IGE's corresponding price totals, and therefore, appear fair and reasonable. The price analysis neither identified any unbalanced pricing nor any items that could be deemed unreasonably low, when compared with the IGE and the average of the price proposals. The price analysis did however, identified [sic] thirty items that could be considered unreasonably high, as the offeror's prices for these items are above 125% of both the IGE and the average of proposals. These items were identified in the Evaluation Notice, dated 22 August 2022 and subsequently addressed by the offeror whose provided narrative supported the proposed prices of identified CLINs. As such, no additional information was required to deem the price proposal fair and reasonable.

- Thalle's revised price proposal of $[redacted] + $[redacted] (Base + Options 1-3), is $[redacted] or approximately [redacted]% above the IGE of $[redacted], but within the maximum awardable range of $[redacted] (IGE of $[redacted] + [redacted]%). The firm reduced their proposed

price by $[redacted] or approximately [redacted]% from their initial proposal of $[redacted]. The revised price proposal was considered fair and reasonable, and no line items were considered unreasonably low or unbalanced. However, the price analysis identified four-line items whose proposed prices were above 25% of both the IGE price and the average of proposal prices, and therefore, considered unreasonably high. These line items, 0002 (Clearing and Grubbing), 0007 (Lime Rock Base) and 0017 and 0034 (Access Road Maintenance), were identified in the Evaluation Notice, dated 22n [sic] August 2022, and subsequently addressed by the offeror whose provided narrative supported the proposed prices submitted for the referenced items. As such, no additional information was required to deem the price proposal fair and reasonable.

(alterations added).

The summary section of the Source Selection Advisory Council's Comparative Analysis Report stated:

- The subject solicitation utilizes the best value trade-off concept. In accordance with the evelution [sic] criteria set-forth in the solicitation, award will be made based on the best overall (i.e., best value) proposal that is determined to be the most beneficial to the Government, with appropriate consideration given to the four evaluation factors: Technical Merit, Past Performance, Small Business Participation, and Price. The SSA will use a trade-off process to determine which offer represents the best value to the Government. This process allows the SSA to consider making award to other than the lowest priced offeror or other than the highest technically rated offeror. To receive consideration for award, a rating of no less than "Acceptable" must be achieved for the Technical Merit Factor and the Small Business Participation Factor, and a rating of no less than "Neutral Confidence" must be achieved for the Past Performance Factor. A rating of "Unacceptable" for the Technical Merit Factor or Small Business Participation Factor will result in an unawardable proposal.
- In consideration of the SSAC assessment of the proposals submitted by F-O JV and Thalle, a need to conduct a trade-off between proposals is not required to make a Best Value recommendation as the highest technically rated proposal is also the lowest priced.
- F-O JV received an overall "Outstanding" rating for Technical Merit. This rating was well documented and validated by the SSAC based on 13 strengths and zero weaknesses and deficiencies associated with their Construction Sequence, Turnover Plan and Construction Schedule, while Thalle received an overall "Good" rating for Technical Merit. These ratings are well documented and have been validated by the SSAC based on strengths, weaknesses, risks, and lack of deficiencies. With regards [sic] to Past Performance, F-O JV received a rating of

"Substantial Confidence" while Thalle received a rating of "Satisfactory Confidence". For Factor 3 – Small Business Participation, both firms received ratings of "Acceptable". The price proposals provided by F-O JV and Thalle were both determined to be fair, reasonable and balanced in accordance with the individual means and method of their proposed technical approaches. The price proposal submitted by F-O JV ($492,335,680.00) was $[redacted] below that submitted by Thalle ($[redacted]). Both price proposals were determined to be within the awardable range by the Cost Estimator.

**Recommendation**: Based on the information herein, the SSAC recommends that award be made to **Forgen-Odin JV**, in the amount of **$492,335,680.00** (Base Plus 3 Options).

(emphasis in original; alterations added).

Source Selection Authority Jerry T. Murphy, reviewed, and concurred with, the evaluations provided by the Source Selection Evaluation Board and Source Selection Advisory Council following debriefing with the Source Selection Advisory Council Chairperson, Source Selection Evaluation Board Chairperson, and Contracting Officer Tracy on September 2, 2022. On September 28, 2022, the Source Selection Authority issued its Source Selection Decision Document. The Source Selection Authority summarized the Source Selection Evaluation Board's evaluations of each offeror. Regarding the evaluation of Factor 1 – Technical Merit, Forgen-Odin JV's revised proposal, the Source Selection Decision Document stated, in part:

### FACTOR 1 – TECHNICAL MERIT

Strengths:

The initial proposal strengths remained unchanged after an evaluation of the revised proposal. The write-up provided by the offeror indicates an exceptional approach and understanding of the requirements in the strengths provided. The information provided in the above strengths shows the risk of unsuccessful performance is low.

Weaknesses:

**The offeror resolved all weaknesses.**

- No major sub-contractor is identified for the work effort of surface and subsurface water management. Since no major sub-contractor is identified, it appears that the work will be self-performed, but there is no clear statement of offeror's intent to self-perform this feature of work (Letter of Commitment requirement stated in Factor 1). **This weakness was resolved in Section 5.1 on page 41 of the revised Volume 1, Factor 1 proposal to show self-performance.**

- Major sub-contractor Terrell Materials Corporation provides the batch plant and materials to produce the CLSM material, but the proposal does not state whether placement of CLSM will be self-performed or whether placement of CLSM will be completed by a major subcontractor (Letter of Commitment requirement stated in Factor 1). **This weakness was resolved in Section 3.5.1 on page 32 of the revised Volume 1, Factor 1 proposal to show self-performance.**

- Offeror's critical path schedule has activities proceeding second Notice to Proceed being issued. The schedule assumes second Notice to Proceed being issued 31 January 2023. The schedule also has site preparation starting on 11 January 2023 and Initial Site Fence Installation and Establish Initial Site Access Roads starting on 26 January 2023. The proposed start of these activities ahead of the second notice to proceed is not allowed by the specifications. Information is contained on pages 1-2 of the schedule on pages 231-232 in Volume 1 Factor 1 (Construction Schedule failure to provide clear and comprehensive detail to minimum requirements). **This weakness was resolved with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal.**

- Turnover Milestones on schedule generally indicate a large amount of total float days. Punchout Inspection, Pre-final inspection, and Final inspection activities are not shown on each Acceptance Section which could extend the actual acceptance dates. Per Specification Section 01 11 00, Para 1.2.5 "the Government intends to request sections of completed work be submitted for acceptance by the Government in not less than 500 linear foot sections. As Acceptance Sections are complete, the Contractor must immediately submit the documentation required of Section 01 45 08 DATA MANAGEMENT AND DATA REQUIREMENTS and Section 01 78 02 CLOSEOUT SUBMITTALS. Following approval, the completed Acceptance Sections will be removed from the Contractor's limits of construction as the Government will be turning these sections over to a future construction contract for embankment construction (Construction Schedule failure to provide clear and comprehensive detail to minimum requirements). **This weakness was fixed with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal.**

Deficiencies:

**The offeror resolved all deficiencies.**

- The offeror failed to meet the construction schedule duration of 2044 calendar days. The schedule provided is 2010 calendar days. The solicitation stated that a Construction Schedule duration shorter than the contract duration of 2044 calendar days indicates the offeror is

placing additional risk on the Government for any delays between the scheduled completion date and the required contract completion period. The Government will consider a condensed contract duration, which places additional cost or schedule risk on the Government, or which may create a risk of contract or performance failure as "unacceptable". Information is contained in the construction schedule starting on page 231 of Volume One (4th Paragraph under Evaluation Method of Construction Schedule indicates that a Construction Schedule duration shorter than the contract duration of 2044 days will be [sic] result in an overall rating of "unacceptable"). **This deficiency was resolved with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal.**[9]

- Offeror states (Section 1.9) "The full-scale operation will continue until 10,000 LF of CLSM top cover is reached. At that point, we will halt the Project preparation effort and await Government approval of the Demonstration Section." This is not allowed by the specifications since the Government must approve 500 LF test section prior to moving forward. The solicitation information indicated that deviations from the plans and specifications would be labeled as deficiencies (Technical Specification Section 01 11 00 paragraph 1.2.5 states that no work beyond the limits of the Demonstration Section can be performed until Government approval of the Demonstration Section). **This deficiency was resolved in Section 1.9 on page 18 of the revised Volume 1, Factor 1 proposal.**

**Summary:** In summary, the SSEB noted the offerors' revised proposal contained 13 strengths, no weaknesses, and no deficiencies. The solicitation included a total of 17 opportunities to receive additional consideration (strengths) for various items stated in the solicitation. The offeror received strengths for 13 of these items. For the items that were not noted as strengths, the SSEB team determined either that the item did not apply to the offeror's technical approach, the information provided was insufficient to determine how it would be advantageous to the Government, or the item was not addressed in the proposal. The revised proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. As such, F-O JV received a rating of OUTSTANDING for Factor 1, Technical Merit.

---

9 The page cited by the Army Corps of Engineers, page 14 of Forgen-Odin JV's revised Volume 1, Factor 1 proposal, contains "Figure 1.1. Sequence and Timing of Operations" which lists "**Mobilization / Project Initiation**" and "Project Initiation Activities" starting on January 11, 2023 and "**Project Closeout**" for "All Activities" finishing on June, 7 2028 totaling 1,974 calendar days. (emphasis in original).

(capitalization and emphasis in original; alteration and footnote added).

Regarding price, the Source Selection Decision Document stated:

As previously noted, each offeror was advised of CLINs that were deemed high, low, or unbalanced and whether their proposal was within the awardable range during Discussions. All offerors were afforded the opportunity to submit revised pricing that addressed these issues. While F-O JV did revise certain CLINS [sic] to address the Government's concerns, their pricing for both the base and overall total remained unchanged. As detailed in the revised price analysis, dated 26 August 2022, F-O JV's final proposal of $492,335,680.00 (base plus options) is within the awardable range of $[redacted] (IGE + 25%). The total base price of $308,432,100.00 is also below the awardable threshold (IGE+25%) for the base, which Is $[redacted]. Taking the above into consideration and based upon review of all the line items individually, the pricing submitted by F-O JV is reasonable, balanced and considered fair to the government.

(capitalization in original; alteration added).

The Source Selection Decision Document also addressed the Source Selection Evaluation Board's evaluation of Thalle's revised proposal, indicating where protestor resolved weaknesses from its initial proposal in bold:

### FACTOR 1 – TECHNICAL MERIT

Strengths:

The initial proposal strengths remained unchanged after an evaluation of the revised proposal. The write-up provided by the offeror meets requirements and indicates an adequate approach and understanding of the requirements in the strengths provided. However, in most cases the strengths represent a minimal coverage of the information requested for the items noted for additional consideration. The SSEB assigned strengths in accordance with the wording of the solicitation but note that the lack of detail in the provided information reduces the overall value of these strengths. The additional information provided in the above strengths shows the risk of unsuccessful performance is moderate.

Weaknesses:

- Significant Weaknesses: Offeror provided a plan for subsurface water management on pages 37-42 of the proposal. However, the Government has determined that the planned 5-foot-deep trenches on both sides of the foundation footprint will not be sufficient to adequately dewater the foundation. Additional sumps as needed are mentioned but may also be insufficient to successfully dewater the site. Due to a limited zone of influence of a five-foot deep dewatering trench to dewater a zone that is approximately 320 feet in width calls into question the feasibility of the proposed dewatering approach to

meet the specification requirements. This appreciably increases the risk of unsuccessful performance, since under estimation of the dewatering effort will lead to schedule delays and cost increases (Minimum CSTP requirement #5). **This significant weakness was resolved on pages 53-55 of the revised Volume 1, Factor 1 proposal.**

- Significant Weaknesses: Offeror's overall schedule exhibits significant weakness in the substantial lack of detail. The schedule included in the proposal does not contain the level of detail that would represent a thorough understanding of the requirements of the project that is the subject of this solicitation. Lack of detail leads to an inability to confirm agreement and coordination between the technical narrative and the schedule. It does not instill confidence that the offeror thoroughly understands the requirements of the solicitation. While the provided schedule contains flaws, the main issue is with the lack of detail. The individual flaws are not noted separately, because correction of the flaws only would not change the significant weakness of the schedule due to its lack of detail (Construction Schedule failure to provide clear and comprehensive detail to minimum requirements). **This significant weakness remains. Although some additional details were provided in the revised proposal, it does not demonstrate a thorough understanding of the requirements of the project that is the subject of this solicitation. As examples of the lack of detail in the schedule, the schedule provides no activities related to completion, acceptance and turn-over of portions of the work during construction. This is an important section of the technical approach, and it is not included in the schedule. Additionally, the schedule does not provide detail of the transition from demonstration sections to the production work to show an understanding of the relationship of these activities to the overall workflow. Overall, the lack of detail in the construction schedule makes it difficult to evaluate and corroborate the feasibility of the proposed approach. As stated in the solicitation, the Construction Schedule must be corroborated by the Construction Sequence and Turnover Plan. This lack of corroboration does not provide confidence that the Offeror has a thorough understanding of the project requirements and how these requirements will impact the flow of work through the schedule.**

- Significant Weaknesses: Offeror's sequence of work between Foundation preparation and Cutoff Wall activities are inconsistent. On pages 2 & 3 of the offeror's proposal, Offeror identifies the order and sequence of activities of the project, and that following successful completion of the demonstration section at STA 445+00, the operation will move to STA 308+00 and proceed clockwise to

STA 460+00. At that time, the second demonstration section (STA 460+00 to 465+00) will be completed and once approved, crews will continue along the southern heading to STA 868+50 to complete the base bid of the contract. In the Conceptual/Draft Cutoff Wall Plan (an attachment authored by the Cutoff Wall (major) subcontractor), the narrative states that the demonstration section for the Cutoff Wall will occur at STA 460+00 to 465+00 and that following completion of and Government approval of the Cutoff Wall demonstration section that production work will be performed "first between STA 428+00 and 548+00 at the southeastern corner of the project. This location and sequence are questionable as it is not clear in any other area of the offeror's proposal as to "if" the foundation will be prepared to allow the cutoff wall production work to progress as stated in the Conceptual/Draft Cutoff Wall Plan. It is impossible for the Government to corroborate the offeror's narrative description of their sequence with the construction schedule as it (construction schedule) is overly simplistic and lacks sufficient detail to determine if the offeror's proposal can achieve both foundation preparation activities and begin cutoff wall demonstration within 180 calendar days of completing the demonstration of CLSM Top Cover or following completion of 10,000 feet of CLSM Top Cover as required in Section 01 11 00 paragraph 1.2.5 of the technical specifications given the conflicting sequence provided by the prime contractor and major (cutoff wall) subcontractor (Minimum CSTP requirement #1). **This significant weakness was resolved on pages 19-20 of the revised Volume 1, Factor 1 proposal.**

- Weakness: Offeror did not provide a Letter of Commitment for a major subcontractor to perform surface and sub-surface water management, nor was it clearly stated that the offeror would self-perform this critical activity. The offeror's narrative on pages 37-42 provides a general overview of surface and sub-surface water management and seems to indicate that it could be self-performed by the offeror, however there is no explicit statement that it will be self-performed (Letter of Commitment requirement stated in Factor 1). **This weakness was resolved with a letter of commitment on page 18 of the revised Volume 1, Factor 1 proposal. And an explanation on page 52 of the revised Volume 1, Factor 1 proposal.**

Deficiencies:

- No deficiencies were identified.

**Summary:** In summary, the SSEB noted the offerors' revised proposal contained nine strengths, one weakness which was considered significant, and no deficiencies. The solicitation included a total of 17 opportunities to receive additional consideration (strengths) for various items stated in the

solicitation. The offeror received strengths for nine of these items. For the items that were not noted as strengths, the SSEB determined either that the item did not apply to the offeror's technical approach, the information provided was insufficient to determine how it would be advantageous to the Government, or the item was not addressed in the proposal. While nine strengths are noted, in most cases the strengths represent a minimal coverage of the information requested for the items noted for additional consideration. The SSEB assigned strengths in accordance with the wording of the solicitation but notes that the lack of detail in the provided information reduces the overall value of these strengths. Thalle's revised proposal contains at least one strength, and risk of unsuccessful performance is low to moderate. Although the proposal contains nine strengths, they are largely offset by the significant weakness and the general lack of sufficient detail that prevents a higher rating. As such, Thalle received a rating of GOOD for Factor 1, Technical Merit.

## FACTOR 2 – PAST PERFORMANCE

Thalle, who received an initial past performance rating of Satisfactory Confidence, did not submit any revisions to their past performance proposal and therefore retains a rating of Satisfactory Confidence for Factor 2 – Past Performance.

## FACTOR 3 – SMALL BUSINESS PARTICIPATION

Thalle received a revised rating of "Acceptable" for Factor 3.

Thalle provided a revised breakdown of the total planned percentage and total contract amount for small businesses. This is reflected in the revised sub-contractors that will be utilized within the base and option years for the demonstrated supplies/services. The revised contract value is $[redacted]. The total dollar amount allotted for small businesses is $[redacted] or [redacted]% of the total contract amount. The total dollar amount allotted for other than small businesses is $[redacted] or [redacted]% of total contract amount.

| Socio-Economic Category | Dollar Value | Contract Value |
|---|---|---|
| Small Disadvantaged Business | [redacted] | [redacted] |
| Women-Owned Small Business | [redacted] | [redacted] |
| HUBZone Small Business | [redacted] | [redacted] |
| Veteran Owned Small Business | [redacted] | [redacted] |
| Service-Disabled Veteran Owned Small Business | [redacted] | [redacted] |

**Summary:** Based on the information detailed herein, the revised proposal provided by Thalle indicates the firm has an adequate approach and

understanding of small business objectives; as such, a rating of ACCEPTABLE was given for Factor 3 – Small Business Participation.

**FACTOR 4 – PRICE**

As previously noted, each offeror was advised of CLINs that were deemed high, low, or unbalanced and whether their proposal was within the awardable range during Discussions. All offerors were afforded the opportunity to submit revised pricing that addressed these issues. Thalle submitted revised pricing that was $[redacted] less than their initial proposal price of $[redacted]. As detailed in the revised price analysis, dated 26 August 2022, Thalle's final proposal of $[redacted] (base plus options) is within the awardable range of $[redacted] (IGE + 25%). The total base price of $[redacted] is also below the awardable threshold (IGE+25%) for the base, which is $[redacted]. Taking the above into consideration and based upon review of all the line items individually, the pricing submitted by Thalle is reasonable, balanced and considered fair to the government.

(capitalization and emphasis in original).

The Source Selection Decision Document explained the "**Source Selection Advisory Council's Comparative Analysis and Recommendation**" as follows:

The SSAC reviewed the SSEB reports, the Past Performance Evaluations, the Small Business Participation Evaluations, and the Price Analyses to ensure that the evaluation process was conducted in accordance with the evaluation criteria established in the solicitation and that the ratings assigned were appropriately and consistently applied to all offerors.

The review conducted by the SSAC substantiated the consensus evaluation ratings as well as the price analyses completed by the Cost Estimator. The SSAC found that the evaluation ratings and the price analyses appeared accurate, consistent, and in accordance with the prescribed methodology established in the solicitation. After validating the consensus evaluation ratings assigned by the SSEB and in concurring with the price analyses, the SSAC concluded their review on 7 September 2022. Based on the information herein, the SSAC recommended that award be made to F-O JV, in the amount of $492,335,680.00 (base and options).

On 2 September 2022, the SSEB Chairperson, SSAC Chairperson, and the Contracting Officer briefed me on the information provided above and received my concurrence on the recommended selection of the offeror identified as the best value to the Government. As the Source Selection Authority, I reviewed the SSAC Report to validate whether the evaluations were done in accordance with the solicitation. Based on my independent judgement and reviews of the documentation outlining the results of the technical, past performance, and small business evaluations and price analyses, I concur with the aforementioned evaluations.

(emphasis in original).

The Source Selection Decision Document concluded:

The solicitation stated that the award will be made based on the best overall proposal that is determined to be the most beneficial to the Government (i.e., best value), with appropriate consideration given to the four evaluation factors: Technical Merit, Past Performance, Small Business Participation, and Price. To receive consideration for award, a rating of no less than "Acceptable" must be achieved for the Technical Merit Factor and Small Business Participation Factor. A rating of "Unacceptable" for any Factor will result in a rating of "Unacceptable" for the entire proposal. It also stated that the non-priced factors are listed in descending order of importance and that all three evaluation factors other than price, when combined, are significantly more important than price. Finally, offerors were cautioned that the award may not necessarily be made to the lowest price offeror or the highest technically rated offeror.

The results of the revised evaluations found that for Factor 1, Technical Merit, F-O JV and K-P & J JV [Kiewit-Phillips JV] had addressed all weaknesses and deficiencies and were now rated as "Outstanding", while Thalle had addressed all but one significant weakness and was now rated as "Good". Thalle, also originally rated "Marginal" for Factor 3, Small Business Participation, received a revised rating of "Acceptable" after addressing their Proposed Small Business Participation Plan. In addition, two of the three offerors, F-O JV and Thalle submitted revised pricing that was within the awardable range, but F-O JV's pricing was $[redacted] lower than the next lowest offer from Thalle. K-P & J JV's pricing was still outside the awardable range, making its proposal unawardable. As such, K-P & J JV's proposal was not included in the consideration for award or the trade-off analysis.

In conducting a trade-off analysis of the two offerors that remained in consideration for award, I considered that F-O JV received an overall "Outstanding" rating for Factor 1, Technical Merit, with zero weaknesses or deficiencies and thirteen strengths under additional considerations associated with their proposed Construction Sequence and Turnover Plan, and their Construction Schedule, including detailing the external influences on the construction area, the establishment of an on-site batch plant, and the mobile or stationary equipment necessary for rock crushing and/or processing of excavated material. The results indicated an exceptional approach and understanding of the requirements. In regard to Thalle, the offeror received an overall "Good" rating for Factor 1, Technical Merit, with nine strengths under additional considerations and zero deficiencies, but had one significant weakness related to their proposed Construction Schedule exhibiting a substantial lack of detail. While nine strengths were noted under additional considerations, in most cases the strengths represented minimal coverage of the information requested in the solicitation. The results ultimately indicated a thorough approach and understanding of the requirements. When offsetting the strengths and

accounting for Thalle's significant weakness, F-O JV still provided the better offer as they were the highest remaining technically rated offeror under Factor 1, Technical Merit. With regards [sic] of Factor 2, Past Performance, F-O JV received a rating of "Substantial Confidence" while Thalle received a rating of "Satisfactory Confidence." For Factor 3, Small Business Participation, both firms received ratings of "Acceptable." As the solicitation stated that the non-priced factors are listed in descending order of importance, and that all three evaluation factors other than price, when combined, are significantly more important than price, the combination of the overall higher ratings received for Factor's [sic] 1 and 2, the equal rating received for Factor 3, and the lowest price received for Factor 4, F-O JV's proposal is determined to provide the best value to the Government. Considering the above, there is no further trade-off that exists that would provide the Government a better value.

Finally, based on adequate price competition and comparison to the revised IGE, dated 9 August 2022, the Contracting Officer and I determined the proposed price of $492,335.680.00 (base and options) is fair and reasonable as it is within the awardable range of $[redacted] (IGE+25%). The total base price of $308,432,100.00 is also below the awardable threshold (IGE+25%) for the base, which is $[redacted]. In addition, F-O JV's price is $[redacted] lower than next lowest offer from Thalle.

In conclusion, based on my integrated assessment of all proposals, performed in accordance with the evaluation criteria set forth in the solicitation, and the information above, I find that the proposal submitted by F-O JV represents the overall best value to the Government.

(alterations added). Under the heading "**Decision Statement**," the Source Selection Authority determined Forgen-Odin JV's revised proposal "in the amount of $492,335,680.00 (base and options) represents the best value to the Government, based on my assessment and comparison of the offerors' technical merit, past performance, small business participation, and proposed prices." (emphasis in original).

On September 28, 2022, the Army Corps of Engineers notified the offerors of its award of Contract No. W912EP22C0017 to Forgen-Odin JV. On September 30, 2022, protestor requested a post-award debriefing. In the debriefing letter to the protestor, Contracting Officer Tracy provided the following table summarizing the evaluation factors:

| Offeror | Factor 1 Technical Merit | Factor 2 Past Performance | Factor 3 Small Business Participation | Factor 4 Price |
|---|---|---|---|---|
| Thalle Construction Co., Inc. | Good | Satisfactory Confidence | Acceptable | [redacted] |
| Forgen-Odin JV | Outstanding | Substantial Confidence | Acceptable | $492,336,680.00 |

Under the heading "**Rationale for Award**," Contracting Officer Tracy explained:

> The evaluation of the revised proposal found that for Factor 1, Technical Merit, Thalle had one significant weakness. A rating of "Good" was given for Factor 1. Thalle received a rating of "Acceptable" for their Proposed Small Business Participation Plan. Thalle also proposed pricing that was within the awardable range.

> The award was made based on the independent judgment of the Source Selection Authority, and on a comparative assessment of proposals, including technical and nontechnical factors and elements against all source selection criteria in the solicitation. It was taken into consideration the findings of the Source Selection Evaluation Board, our own evaluation of those findings, to include the evaluation of the individual factors resulting in the ratings of the qualified offeror. The proposed pricing was examined to determine if it was realistic, fair, and reasonable. The award was made to the best overall offeror.

(emphasis in original). Subsequently, on November 18, 2022, protestor requested an enhanced post-award debriefing, which protestor received on December 19, 2022.

On December 23, 2022, protestor filed a protest of the Army Corps of Engineers' award to Forgen-Odin JV at the United States Government Accountability Office (GAO). Protestor contended:

> Had USACE properly evaluated Thalle's technical proposal, it would not have assessed a Significant Weakness against Thalle's proposal. That in turn would have increased Thalle's technical rating from Good to Outstanding, putting it on par with Forgen-Odin. The resulting best value trade off would have identified Thalle as the best value to the government.

On December 29, 2022, protestor filed a supplemental protest with the GAO and raised two additional claims regarding the Army Corps of Engineers' evaluation of protestor and the intervenor's Past Performance. On February 2, 2023, protestor filed a second supplemental protest at the GAO in response to the agency report. Before the GAO, protestor alleged:

> In its technical factor evaluation, USACE seriously misevaluated Thalle's technical proposal, treated Thalle and Forgen-Odin [unequally, and failed to disqualify Forgen-Odin's proposal for numerous deficiencies that should have disqualified its proposal from consideration from [sic] award. When evaluating past performance, USACE applied unstated evaluation criteria, failed to follow the terms of the RFP, and treated Thalle and Forgen-Odin unequally. USACE also failed to follow the terms of the RFP when evaluating Forgen-Odin's small business utilization under Factor 3; had USACE adhered to the RFP's terms, it would have been forced to find Forgen-Odin's proposal unacceptable. The result of a correct technical, past performance, and small business utilization evaluation would have

resulted in Forgen-Odin's disqualification, leaving Thalle as the only offeror with an awardable proposal. Because the best value decision did not consider any of those evaluation errors, it was fundamentally unsound and cannot for [sic] the basis of award to Forgen-Odin.

(alterations added). Protestor also asserted at the GAO that "the best value decision did not properly compare the merits of the proposals or look behind the adjectival ratings of each offeror as required."

On March 27, 2023, the GAO denied Thalle's protests in full. <u>See</u> <u>generally</u> <u>Thalle Constr. Co., Inc.</u>, B-421345 <u>et al.</u>, 2023 WL 2890448 (Comp. Gen. Mar. 27, 2023). The GAO found "the evaluation criteria reasonably encompassed the requirement to provide details regarding completion, acceptance, turnover, and transition from demonstration to production within the construction schedule" and saw "no basis to question the agency's assessment of a significant weakness" under the Technical Merit factor.

Thereafter, protestor filed its post-award bid protest in the United States Court of Federal Claims. Protestor's complaint contained one count, "**Failure to Evaluate Forgen-Odin in Accordance with RFP**," (capitalization and emphasis in original), which encompassed a number of separate issues. In the protest before this court, protestor first alleged that the Army Corps of Engineers "failed to enforce the RFP requirements for letters of commitment from all major subcontractors in its evaluation of FOJV's proposal." Protestor argued Forgen-Odin JV's subcontractor Terrell "satisfies the RFP's definition of a major subcontractor, since FOJV submitted Terrell's experience as part of its proposal," but contended "Terrell promised to provide those services to Odin Construction, LLC rather than to FOJV JV [sic]." (alteration added). Second, protestor argued that the Army Corps of Engineers "overlooked" intervenor's "lack of a Past Performance record," when Forgen-Odin JV included past performance references related to work completed by "Odin Construction Solutions, **Inc.** rather than Odin Construction Solutions, **LLC.**" (emphasis in original). Third, protestor argued that Forgen-Odin JV "did not provide the required record of Small Business Participation in prior efforts." Fourth, protestor alleged the Army Corps of Engineers ignored Forgen-Odin JV's failure to meet the required schedule duration when the Army Corps of Engineers "concluded that FOJV resolved the Deficiency that USACE initially identified in the schedule, stating, 'This deficiency was resolved with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal.'" (capitalization in original). Protestor asserted that the schedule cited by the Army Corps of Engineers contains a total duration of 1,974 calendar days rather than the required 2,044 calendar days and the Army Corps of Engineers should have maintained the deficiency.

Protestor filed a motion for judgment on the Administrative Record raising the same issues it raised in its complaint. Subsequently, the parties filed a joint status report which stated, in part:

Thalle hereby **withdraws** its protest ground challenging the Agency's evaluation of Forgen-Odin's past performance under evaluation Factor 2. Further, because Thalle's challenge to the Agency's evaluation of Forgen-Odin's small business participation proposal relies on assertions similar to those related to past performance, Thalle hereby **withdraws** its protest

ground challenging the Agency's evaluation of Forgen-Odin's small business participation under evaluation Factor 3.

(capitalization and emphasis in original). The joint status report continued: "The remaining protest grounds challenge the Agency's evaluation of a letter of commitment from one of Forgen-Odin's proposed subcontractors [Terrell], and the Agency's evaluation of Forgen-Odin's proposed schedule duration." (alteration added).

For the remaining issues before the court, protestor first argues that one of the letters of commitment Forgen-Odin JV included in its proposal did not meet the definition of a letter of commitment and should have resulted "in a Deficiency and the disqualification of Forgen-Odin's proposal." Protestor asserts the letter from Terrell did not meet the requirements of a letter of commitment under the RFP because the Terrell commitment letter was not addressed to Forgen-Odin JV, and "did not bind Terrell to perform the CLSM work for Forgen-Odin as the prime contractor, but instead for Odin Construction, LLC." Protestor argues "Terrell's letter did not satisfy those two basic requirements for a letter of commitment, the Corps could not consider the letter a letter of commitment and was prohibited from assuming that Terrell intended to commit its services to Forgen-Odin."

Protestor also argues the Army Corps of Engineers improperly credited Forgen-Odin JV's proposed schedule duration when the Army Corps of Engineers cited to page 14 of Forgen-Odin JV's revised Volume 1, Factor 1 proposal. Protestor asserts the schedule cited by the Army Corps of Engineers on page 14 of the revised Volume 1, Factor 1 proposal "shows a start date of January 11, 2023 and a project closeout date of June 7, 2028, for a duration of 1,974 calendar days," and not the required 2,044 days. Protestor contends "the SSEB clearly (and improperly) found the schedule of 1,974 days to meet the minimum duration, irrespective of the RFP's minimum requirement. The Corps therefore had an obligation to maintain the Deficiency that it initially attributed to Forgen-Odin's proposal, and deem its proposal unawardable." Protestor asserts intervenor's revised proposal contained "substantive deficiencies" that should have made the proposal "unacceptable and remove Forgen-Odin from the competition." Protestor argues that if not for the Army Corps of Engineers' "faulty evaluation and its impact on the resultant best-value tradeoff analysis, Thalle would have been well within the zone of active consideration for award." Protestor requests the court find the Army Corps' of Engineers failure to deem Forgen-Odin JV's proposal unacceptable based on the letter of commitment and schedule duration "was arbitrary, capricious, or otherwise an abuse of discretion and not in accordance with procurement law and policy."

In response to protestor's motion for judgment on the Administrative Record, defendant and intervenor filed cross-motions for judgment on the Administrative Record. Defendant and intervenor both argue that the letter from Terrell included in intervenor's proposal referenced the RFP currently at issue in the above captioned bid protest and further, that the Terrell commitment letter listed the correct mailing address for Forgen-Odin JV. Both defendant and intervenor further assert that the letter from Terrell satisfies the purpose of the letter of commitment requirement in the RFP because the letter indicates Terrell is willing to be bound to the project. Defendant and intervenor alternatively argue that the type of work Terrell will perform "does not fall within the

solicitation's definition of a major subcontractor from whom a commitment letter would be required." Intervenor separately argues Terrell's commitment to a member of Forgen-Odin JV is sufficient to bind Terrell to the joint venture.

Regarding the Army Corps of Engineers' assessment of Forgen-Odin JV's schedule duration, defendant and intervenor argue Forgen-Odin JV provided a revised Construction Schedule that meets the required duration of 2,044 calendar days on pages 232-268 of Forgen-Odin JV's revised proposal. Defendant concedes that the Army Corps of Engineers made a "clerical error" when it cited to page 14 of Forgen-Odin JV's revised proposal. Defendant contends the figure on page 14 is a "'Sequence and Timing of Operations' table" that "does not include award and pre-construction activity." Intervenor makes the same arguments as defendant, but additionally states protestor "cites a portion of Forgen's proposal that addressed the Construction Sequence and Turnover Plan, rather than the Construction Schedule."

After the motions were fully briefed, the court held oral argument on the parties' cross-motions for judgment on the Administrative Record. Due to the urgency, as represented by the United States to the court, and, as indicated above, the court issued an oral decision on the cross-motions for judgment on the Administrative Record to the parties. This Opinion memorializes the oral decision provided to the parties.

## DISCUSSION

As indicated above, after protestor filed its motion for judgment on the Administrative Record, the parties filed a joint status report in which protestor withdrew "its protest ground challenging the Agency's evaluation of Forgen-Odin's past performance under evaluation Factor 2." Protestor also withdrew "its protest ground challenging the Agency's evaluation of Forgen-Odin's small business participation under evaluation Factor 3." Therefore, the only elements of count one of protestor's complaint, "Failure to Evaluate Forgen-Odin in Accordance with RFP," currently before the court, are the agency's evaluation of Terrell's commitment letter and the agency's evaluation of the intervenor's revised construction schedule.

As indicated by the United States Court of Appeals for the Federal Circuit:

Cross-motions for judgment on the administrative record are governed by Rule 52.1(c) of the Rules of the United States Court of Federal Claims. "In deciding these motions, the [Claims Court] considers 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record.'"

XOtech, LLC v. United States, 950 F.3d 1376, 1379–80 (Fed. Cir. 2020) (alteration in original) (quoting Palantir USG, Inc. v. United States, 904 F.3d 980, 989 (Fed. Cir. 2018) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006)));see also DigiFlight, Inc. v. United States, 165 Fed. Cl. 588, 598 (2023); Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. 681, 691 (2020) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005)); Glocoms, Inc. v. United States, 149 Fed. Cl. 725, 731 (2020); AAR Mfg., Inc. v. United States, 149 Fed. Cl. 514, 522 (2020); Centerra Grp.,

LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 223 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1353-54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" (alteration added) (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); Safeguard Base Operations, LLC v. United States, 989 F.3d 1326, 1343 (Fed. Cir. 2021); Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332; Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004); DigiFlight, Inc. v. United States, 165 Fed. Cl. at 597. In Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345 (Fed. Cir. 2004), the Federal Circuit explained that "[u]nder the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Id. at 1351 (alteration added) (quoting Impresa Construzioni Geom. Domenico Garufi v. United

States, 238 F.3d at 1332)); see also Harmonia Holdings Grp., LLC v. United States, 999 F.3d 1397, 1403 (Fed. Cir. 2021); Palantir USG, Inc. v. United States, 904 F.3d 980, 990 (Fed. Cir. 2018); AgustaWestland North Am., Inc. v. United States, 880 F.3d 1326, 1332 (Fed. Cir. 2018); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003).

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350-51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057–58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)))), reh'g and reh'g en banc denied (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2018);[10] see also Veterans

---

[10] The language of 5 U.S.C. § 706 provides in full:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Contracting Grp., Inc. v. United States, 920 F.3d 801, 806 (Fed. Cir. 2019) ("In a bid protest, we follow Administrative Procedure Act § 706 and set aside agency action 'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252 (Fed. Cir. 2015)); Per Aarsleff A/S v. United States, 829 F.3d at 1309; Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (first alteration added) (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Off. Design Grp. v. United States, 951 F.3d 1366, 1371 (Fed. Cir. 2020); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (alteration added) (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285-86)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); Connected Glob. Sols., LLC v. United States, 162 Fed. Cl. 720, 732 (2022).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

[W]e will not vacate an agency's decision unless it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (alteration added) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ." (alteration added)); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007) (alterations added). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The

court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (internal citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); DynCorp Int'l, LLC v. United States, 10 F.4th 1300, 1315 (Fed. Cir. 2021) ("Review in bid protests under the arbitrary-and-capricious standard is 'highly deferential.' Under it, we must 'sustain an agency action evincing rational reasoning and consideration of relevant factors.'" (internal citations omitted)); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard, the Federal Circuit stated "'the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.'" (quoting Tex. Crushed Stone Co. v. United States, 35 F.3d 1535, 1540 (Fed. Cir. 1994))); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. 186, 199 (2019); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004); and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal dismissed, 559 F. App'x 1033 (Fed. Cir. 2014); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 382; Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal

procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009)), reh'g en banc denied (Fed. Cir. 2014) (alteration added); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations.").

Furthermore, according to the United States Court of Appeals for the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Agile Def., Inc. v. United States, 959 F.3d 1379, 1385 (Fed. Cir. 2020) ("As we have repeatedly recognized, '[c]ontracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (alteration in original) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 (internal quotation marks and citation omitted in original))); AgustaWestland N. Am., Inc. v. United States, 880 F.3d at 1332 ("Where, as here, a bid protester challenges the procurement official's decision as lacking a rational basis, we must determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' recognizing that 'contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33 (internal quotation marks and citation omitted))); Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke [ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (alteration in original) (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

"Contracting officers 'are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process,'" PAI Corp. v. United States, 614 F.3d at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332), and "[a]ccordingly, procurement decisions are subject to a 'highly deferential rational basis review.'" Id. (alteration added) (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (internal quotation marks omitted)).

When the contracting officer's discretion grows, so does the burden on the protestor. As noted in D & S Consultants, Inc. v. United States:

The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. DynCorp Int'l v. United States, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion"; "best-value" awards afford the contracting officer additional discretion. Id. Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (citations omitted)). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59); see also Cleveland Assets, LLC v. United States, 883 F.3d 1378, 1382 (Fed. Cir. 2018) ("The arbitrary and capricious standard of review is 'highly deferential,' and procurement officials 'have a great deal of discretion' in their decisions, particularly when, as here, 'the contract is to be awarded to the bidder or bidders that will provide the agency with the best value.'") (quoting Croman Corp. v. United States, 724 F.3d at 1363); Croman Corp. v. United States, 724 F.3d at 1363; see also Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958; Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 707 (2011) ("[A] plaintiff's burden 'is elevated where the solicitation contemplates award on a "best value" basis.'" (alteration added; internal citations omitted)); Matt Martin Real Estate Mgmt. LLC v. United States, 96 Fed. Cl. 106, 113 (2010); Serco v. United States, 81 Fed. Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Fall Lodging Realty, LLC v. United Sates, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995-96; Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 578 (2017); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (alterations added) (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300

(Fed. Cir. 1999)); <u>see also</u> <u>Turner Constr. Co., Inc. v. United States</u>, 645 F.3d at 1387; <u>Sierra Nevada Corp. v. United States</u>, 107 Fed. Cl. 735, 759 (2012); <u>Filtration Dev. Co., LLC v. United States</u>, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

<u>Bannum, Inc. v. United States</u>, 404 F.3d at 1351; <u>T Square Logistics Servs. Corp. v. United States</u>, 134 Fed. Cl. 550, 555 (2017); <u>FirstLine Transp. Sec., Inc. v. United States</u>, 119 Fed. Cl. 116, 126 (2014), <u>appeal</u> <u>dismissed</u> (Fed. Cir. 2015); <u>Eco Tour Adventures, Inc. v. United States</u>, 114 Fed. Cl. at 22; <u>Archura LLC v. United States</u>, 112 Fed. Cl. at 496. To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. <u>See</u> 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error." (alteration added)); <u>see also</u> <u>Sys. Stud. & Simulation, Inc. v. United States</u>, 22 F.4th 994, 997 (Fed. Cir. 2021); <u>Off. Design Grp. v. United States</u>, 951 F.3d at 1371; <u>Glenn Def. Marine (ASIA), PTE Ltd. v. United States</u>, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); <u>IT Enter. Sols. JV, LLC v. United States</u>, 132 Fed. Cl. 158, 173 (2017) (citing <u>Bannum v. United States</u>, 404 F.3d at 1357-58). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. <u>See</u> <u>Statistica, Inc. v. Christopher</u>, 102 F.3d 1577, 1581 (Fed. Cir. 1996); <u>Data Gen. Corp. v. Johnson</u>, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." <u>Data General</u>, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." <u>Statistica</u>, 102 F.3d at 1582; <u>see</u> <u>CACI, Inc.-Fed. v. United States</u>, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award–that it was within the zone of active consideration.'" (citation omitted)).

<u>Alfa Laval Separation, Inc. v. United States</u>, 175 F.3d 1365, 1367 (Fed. Cir.), <u>reh'g</u> <u>denied</u> (Fed. Cir. 1999) (alteration in original); <u>see also</u> <u>WellPoint Mil. Care Corp. v. United States</u>, 953 F.3d 1373, 1382 (Fed. Cir. 2020) ("[T]he mere possibility of harm is insufficient to rise to the level of prejudicial error. We have held that the appropriate standard is that the bid protestor must allege a 'significant error' that affected the award decision." (alteration added) (quoting <u>Alfa Laval Separation, Inc. v. United States</u>, 175 F.3d at 1368;

Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

Terrell's Commitment Letter

As explained above, the RFP provided:

FACTOR 1 – TECHNICAL MERIT

Factor 1, Technical Merit includes the following: Construction Sequence and Turnover Plan, and Construction Schedule

In responding to this factor, the objective should be to instill confidence that the offeror thoroughly understands the requirements of the solicitation and has the expertise and experience required to successfully satisfy or exceed the solicitation requirements within the required period of performance (See Section 00700, FAR Clause 52.211-10).

In accordance with the Limitations on Substitutions or Certain Items of Work, Positions and/or Subcontractors paragraph in Section 00800 of this solicitation, a letter of commitment must be provided as established under "Construction Sequence and Turnover Plan" for any proposed major subcontractor for the following: cutoff wall construction, surface and subsurface water management, placement of Controlled Low Strength Material (CLSM), and blasting. If any of that work is intended to be self-performed, it should be stated in the proposal.

A major subcontractor is defined as any subcontractor whose experience is submitted as part of this proposal and is also identified in the non-substitution clause in Section 00800 of the solicitation.

(capitalization in original).[11] The RFP continued:

---

[11] As also described above, under the heading, "**LIMITATIONS ON SUBSTITUTIONS FOR CERTAIN POSITIONS AND/OR SUBCONTRACTORS**," (emphasis and capitalization in original), the RFP stated:

~~The award decision for this contract was based, in part, on an evaluation of the personnel and/or subcontractors the Contractor included in its proposal for the positions and/or items of subcontracted work identified at the end of this paragraph.~~ The Offeror agrees these key personnel and/or

A letter of commitment is defined as a letter from a major subcontractor on official company letterhead addressed to the offeror as prime contractor, identifying the work the subcontractor intends to perform, and stating that the subcontractor is willing to be bound to perform the identified work if the offeror is awarded a contract. A letter of commitment simply stating that a major subcontractor commits to submit pricing to the offeror does not satisfy this requirement.

Failure to provide a letter of commitment from any proposed major subcontractor(s) will be noted as a deficiency. Submission of multiple letters of commitment from proposed major subcontractor for the same portion/items of work or position may be noted as a weakness.

In its initial proposal regarding Controlled Low Strength Material, intervenor informed the agency: "We will locate the onsite central mix portable batch plant in the northeast quadrant of Borrow Area 3 for the onsite production of Controlled Low Strength Material (CLSM). The portable plant requires a concrete foundation that will be constructed prior to mobilizing and erecting the plant." As reflected above, the Terrell commitment letter contains the subject line: "Letter of Commitment for Proposed Contract for Central Everglades Planning Project (CEPP) Contract 11A, EAA A-2 Reservoir Foundation and Cutoff Wall, Palm Beach County, Florida, Solicitation No. W912EP22R0005." The Terrell commitment letter states: "I hereby make the unequivocal commitment that, in the event of an award of a contract to Odin Construction, LLC, that (Terrell Materials Corporation) will fulfill the duties of (Controlled Low Strength Material Manufacturer (CLSM Manufacturer)."

As described in the findings of fact above, the agency evaluated three initial proposals from protestor Thalle, intervenor Forgen-Odin JV, and Kiewit-Phillips JV. The agency found deficiencies for Forgen-Odin JV's initial proposal and Kiewit-Phillips JV's initial proposal resulting in "Unacceptable" ratings for Factor 1 – Technical Merit, which rendered the initial proposals unawardable. As described above, the RFP had warned offerors that "[p]roposals without the specified content may be determined Unacceptable and removed from the competition." (alteration added). The RFP also stated "[t]he Government will not make assumptions concerning intent, capabilities, or experiences." (alteration added). The RFP explained, under the heading, "**Proposal Evaluation**:"

---

subcontractors will be employed as described in its proposal and no substitutes will be employed without prior written approval of the Contracting Officer or Administrative Contracting Officer. The Offeror further agrees that any proposed substitutes shall meet or exceed the qualifications of the original key personnel and/or subcontractors. If the Offeror's proposal did not name a subcontractor for an identified item of work, the Offeror will not be allowed to subcontract that item of work without prior approval of the Contracting Officer or Administrative Contracting Officer.

(strikethrough in original).

The Government intends to evaluate proposals and award a contract without discussions with offerors. Therefore, the offeror's initial proposal should contain the offeror's best terms from a price and technical standpoint. The Government may conduct discussions if the SSA later determines them to be necessary. Further, if the SSA determines that discussions are necessary and if the SSA determines that the number of proposals that would otherwise be in the competitive range exceeds the number at which an efficient competition can be conducted, the SSA may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals.

(emphasis in original).

Therefore, in the August 12, 2022 Competitive Range Determination, the Source Selection Authority and Contracting Officer determined it was in the best interest of the government to allow all the offerors to submit revised proposals and to open further discussions. On the same day, August 12, 2022, the Army Corps of Engineers issued discussions letters to each of the offerors, in which the Army Corps of Engineers identified areas in each of the initial proposals that contained a Weakness, Significant Weakness, Deficiency, or an area of the proposal that was deemed Marginal or Unacceptable. The August 12, 2022 discussions letter from Source Selection Authority and Contracting Officer Tracy to the intervenor identified:

Weaknesses:

- No major sub-contractor is identified for the work effort of surface and subsurface water management. Since no major sub-contractor is identified, it appears that the work will be self-performed, but there is no clear statement of offeror's intent to self-perform this feature of work.
- Major sub-contractor Terrell Materials Corporation provides the batch plant and materials to produce the CLSM material, but the proposal does not state whether placement of CLSM will be self-performed or whether placement of CLSM will be completed by a major subcontractor.
- The proposal's critical path schedule has activities preceding second Notice to Proceed being issued. The schedule assumes second Notice to Proceed being issued 31 January 2023. The schedule also has site preparation starting on 11 January 2023 and Initial Site Fence Installation and Establish Initial Site Access Roads starting on 26 January 2023. The proposed start of these activities ahead of the second notice to proceed is not allowed by the specifications. Information is contained on pages 1-2 of the schedule on pages 231-232 in Volume 1, Factor 1.
- Turnover Milestones on schedule generally indicate a large amount of total float days. Punchout Inspection, Pre-final inspection, and Final inspection activities are not shown on each Acceptance Section

which could extend the actual acceptance dates. Per Specification Section 01 11 00, Para 1.2.5 "the Government intends to request sections of completed work be submitted for acceptance by the Government in not less than 500 linear foot sections. As Acceptance Sections are complete, the Contractor must immediately submit the documentation required of Section 01 45 08 DATA MANAGEMENT AND DATA REQUIREMENTS and Section 01 78 02 CLOSEOUT SUBMITTALS. Following approval, the completed Acceptance Sections will be removed from the Contractor's limits of construction as the Government will be turning these sections over to a future construction contract for embankment construction.

Deficiencies:

- The proposal failed to meet the construction schedule duration of 2044 calendar days. The schedule provided is 2010 calendar days. The solicitation stated that a Construction Schedule duration shorter than the contract duration of 2044 calendar days indicates the offeror is placing additional risk on the Government for any delays between the scheduled completion date and the required contract completion period. The Government will consider a condensed contract duration, which places additional cost or schedule risk on the Government, or which may create a risk of contract or performance failure as "unacceptable". Information is contained in the construction schedule starting on page 231 of Volume 1, Factor 1.
- The proposal states in Section 1.9, "The full-scale operation will continue until 10,000 LF of CLSM top cover is reached. At that point, we will halt the Project preparation effort and await Government approval of the Demonstration Section." This is not allowed by the specifications since the Government must approve 500 LF test section prior to moving forward. The solicitation information indicated that deviations from the plans and specifications would be labeled as deficiencies.

Based on the above deficiencies, Factor 1 – Technical Merit, has been deemed "Unacceptable".

(capitalization in original).

In its revised proposal, intervenor explained:

The Forgen/Odin JV's wholistic approach  to the Dental Treatment/CLSM Placement involves the talents of specialty subcontractors as well as our own self-perform resources. We intend to subcontract with Florida Energy Services, Inc. (FESI) for drilling and blasting in the borrow areas. FESI is a small business that has over a 40 year successful track record performing drilling and blasting, particularly below the water table, in Florida. **The Forgen/Odin JV will then self-perform the crushing and screening**

**operation to manufacture the fine aggregates for the CLSM as further described in Section 10 of the proposal.** We intend to enlist Terrell Materials Corporation to both batch the CLSM as well as to haul the material to the point of placement. The batching will be done via a portable central mix batch plant as described in this section of the proposal. Terrell Materials is a DBE with a successful 15 year track record in the concrete batching industry. **The Forgen/Odin JV will self-perform the placement of CLSM as described in detail in Section 3.5.2 below with our own self-perform resources.**

(capitalization and emphasis in original). Included with intervenor's revised proposal was the same commitment letter from Terrell as in the intervenor's initial proposal, quoted above.

In the September 28, 2022 Source Selection Decision Document, regarding the evaluation of intervenor's revised proposal, the Source Selection Decision Document stated:

Major sub-contractor Terrell Materials Corporation provides the batch plant and materials to produce the CLSM material, but the proposal does not state whether placement of CLSM will be self-performed or whether placement of CLSM will be completed by a major subcontractor (Letter of Commitment requirement stated in Factor 1). **This weakness was resolved in Section 3.5.1 on page 32 of the revised Volume 1, Factor 1 proposal to show self-performance**.

(emphasis in original).

In the above captioned bid protest, protestor argues "Forgen-Odin's proposal should have been rejected for the inclusion of a deficient Letter of Commitment" from Terrell. (capitalization in original). As described above, protestor asserts the letter from Terrell did not meet the requirements of a letter of commitment under the RFP because the Terrell commitment letter was not addressed to Forgen-Odin JV, and "did not bind Terrell to perform the CLSM work for Forgen-Odin as the prime contractor, but instead for Odin Construction, LLC." The Terrell commitment letter was in fact addressed to Odin Construction, LLC, and not to Forgen-Odin JV, the exact name of the offeror responding to the RFP at issue in the above captioned protest.

In its complaint, Thalle alleges that "Terrell's commitment to perform CLSM services for Odin Construction, LLC is meaningless to FOJV, the actual offeror. FOJV failed to submit a satisfactory letter of commitment from Terrell, a major subcontractor." (capitalization in original). In Thalle's motion for judgment on the Administrative Record, protestor argues:

Forgen-Odin's proposal indisputably ignored the Corps' demand that an offeror provide a letter of commitment for any major subcontractor working on CLSM tasks. The RFP stated that "failure to provide a letter of

commitment from any proposed major subcontractor(s) will be noted as a deficiency," and that a deficiency meant the proposal would be deemed "unacceptable." The RFP defined a letter of commitment by identifying several characteristics that it must possess: 1) it must be on company letterhead; 2) it must be addressed to the offeror as prime contractor; 3) it must identify the work the subcontractor intended to perform; and 4) it must bind the subcontractor to performing that work for the offeror as prime contractor. Without those elements, a letter from a purported subcontractor cannot be considered a letter of commitment. The purported letter of commitment from Terrell in Forgen-Odin's proposal did not meet two of the four elements required of a letter of commitment. In other words, it was not a letter of commitment. As a result, USACE should have determined that Forgen-Odin did not submit the required letter of commitment from its CLSM subcontractor, resulting in a Deficiency and the disqualification of Forgen-Odin's proposal. That is not what happened. While Forgen-Odin indicated in its proposal that it would "enlist [Terrell] to both batch the CLSM [and] haul the material to the point of placement," the letter from Terrell that Forgen-Odin submitted 1) was not addressed to Forgen-Odin, but to Odin Construction, LLC; and 2) did not bind Terrell to perform the CLSM work for Forgen-Odin as the prime contractor, but instead for Odin Construction, LLC. In addition to failing to meet the basic requirements of a letter of commitment, Terrell's promise to perform for Odin Construction, LLC was worthless to Forgen-Odin, the actual offeror and eventual prime contractor in the event of an award to Forgen-Odin. Not only is Odin Construction, LLC not the offeror as prime contractor, it is not even a member of Forgen-Odin.

(alterations in original; internal references omitted). Therefore, Thalle contends:

Terrell's letter did not satisfy the requirement that it be addressed to Forgen-Odin. It also failed to meet the requirement for Terrell to bind itself to perform work for Forgen-Odin if Forgen-Odin were awarded the contract. Because Terrell's letter did not satisfy those two basic requirements for a letter of commitment, the Corps could not consider the letter a letter of commitment and was prohibited from assuming that Terrell intended to commit its services to Forgen-Odin. The Corps had no choice but to assess a Deficiency against Forgen-Odin's proposal for its failure to provide a letter of commitment from its CLSM subcontractor. A Deficiency would have made Forgen-Odin's proposal unawardable under the RFP requirements, with the result that the Corps would have awarded the contract to Thalle. The Corps' acceptance of Terrell's letter and failure to eliminate Forgen-Odin's proposal from further consideration for award violated the terms of the RFP and was inherently arbitrary and capricious.

(internal references omitted).

Defendant responds that

> [t]he Corps was rational in determining that the Terrell Materials commitment letter was sufficient to satisfy the purposes for which the Corps imposed the subcontractor commitment letter requirement. As the agency explained before GAO, the purpose of requiring the letter was for the Corps to have confidence that the major subcontractor is in place—and the letter here satisfied that objective. The letter of commitment is written on a template the Corps provided; it has the correct mailing address for Forgen-Odin Joint Venture; it references the correct solicitation, both by name and solicitation number; and it correctly identifies the work that the subcontractor was committing to perform.

(internal references omitted; alteration added). Defendant continues:

> Consistent with the commitment letter requirement's purpose, the Corps had the letter in hand and it clearly provided confidence that Terrell Materials was committed to work on the project. Thalle argues that the letter's failure to list the joint venture as addressee (despite using the correct contract number and mailing address) effectively rendered the letter a nullity.

Intervenor contends:

> Thalle continues to argue form over substance on this issue, and ignores the fact that Terrell's letter of commitment satisfies the requirements of the Solicitation and leaves no question that Terrell committed itself to perform work for the awardee for this specific project. The letter is in the form template provided by the Corps, lists the correct mailing address for the JV, references the Solicitation name and number correctly, and identifies the specific work that Terrell committed to perform.

Intervenor further argues

> the proposal was submitted by an unpopulated[12] joint venture, which is made up wholly of its members. The letter of commitment, which was addressed to one of those members, binds the subcontractor to the joint venture, through its member, and poses no material difference from a letter addressed to the joint venture itself.

(footnote added).

---

[12] This is intervenor's only reference to an "unpopulated joint venture" in its briefs, and intervenor does not elaborate on a definition of, or the significance of, the term "unpopulated joint venture" in the filings with the court.

Alternatively, intervenor argues "even if Terrell's letter did not satisfy the Solicitation requirements, that alleged defect is irrelevant because Forgen was not required to provide a letter of commitment from Terrell." Intervenor contends "Forgen's proposal included all information necessary for the Corps to determine that Terrell was not a major subcontractor for which a letter of commitment was required." Defendant similarly argues that "Terrell Materials does not fall within the solicitation's definition of a major subcontractor from whom a commitment letter would be required."

As indicated above, however, protestor argues "Terrell satisfies the RFP's definition of a major subcontractor, since Forgen-Odin relied on Terrell's experience as part of its proposal, and Terrell would be involved in Forgen-Odin's approach to CLSM placement. The Corps recognized Terrell as a major subcontractor in its evaluation."[13] Intervenor responds that "while Terrell would be enlisted to batch and haul the CLSM to the job site, Forgen would wholly self-perform the placement of the CLSM, obviating any requirement for a Letter of Commitment from Terrell." After the agency identified the lack of clarity about the placement of the Controlled Low Strength Material in intervenor's initial proposal, in intervenor's revised proposal, intervenor clarified that Forgen-Odin JV would self-perform the work of placement of the Controlled Low Strength Material. Both defendant and intervenor point to the language of the RFP which required

> a letter of commitment must be provided as established under "Construction Sequence and Turnover Plan" for any proposed major subcontractor for the following: cutoff wall construction, surface and subsurface water management, placement of Controlled Low Strength Material (CLSM), and blasting. If any of that work is intended to be self performed, it should be stated in the proposal.

---

[13] In its submissions, protestor frequently does not specify to which proposal of the intervenor, the original proposal or the revised proposal, Thalle is referencing. The court notes, however, that any challenge regarding the initial proposals and award to intervenor is not before the court. As explained by a Judge of the United States Court of Federal Claims,

> the plaintiff's challenges to USACE's original evaluation of proposals are not properly before this court, as the relief that would otherwise be available has already been granted due to the agency's decision to re-evaluate the proposals. Therefore, because the agency has already agreed to re-evaluate the proposals, the plaintiff's claims regarding USACE's original evaluation of proposals and its award of the contract to Bowhead must be dismissed as moot.

Eskridge Rsch. Corp. v. United States, 92 Fed. Cl. 88, 94 (2010); see also Tenica & Assocs., LLC v. United States, 123 Fed. Cl. 166, 170 (2015). In the above captioned protest, the agency conducted discussions and received and evaluated revised proposals.

Both defendant and intervenor emphasize the word "placement" in the RFP regarding Controlled Low Strength Material in their arguments to the court, contending Terrell only would be batching and transporting the Controlled Low Strength Material and would not be placing the Controlled Low Strength Material. Therefore, intervenor argues "Forgen's proposal included all information necessary for the Corps to determine that Terrell was not a major subcontractor for which a letter of commitment was required." At the oral argument, defendant's counsel argued: "It's plain in the solicitation that the activities that make someone into a major subcontractor are the placement, not the manufacturing of CLSM materials, and Terrell just does not meet that definition if that is what they clarified."

At the oral argument, protestor's counsel argued that the Administrative Record did not support a distinction between the batching, transporting, and placing of the Controlled Low Strength Material. Protestor's counsel continued: "There wasn't a material difference for purposes of being a major subcontractor between batching and placing. The agency also understood that, because when they – when the agency first evaluated Forgen-Odin's initial proposal, they found a weakness related to this issue."[14]

As described above, in the August 12, 2022 discussions letter to Forgen-Odin JV, for Factor 1 – Technical Merit, the Source Selection Authority and Contracting Officer Tracy noted a weakness regarding the placement of the Controlled Low Strength Material:

- Major sub-contractor Terrell Materials Corporation provides the batch plant and materials to produce the CLSM material, but the proposal does not state whether placement of CLSM will be self-performed or whether placement of CLSM will be completed by a major subcontractor.

This assigned weakness reflects that the agency was concerned about the placement of the Controlled Low Strength Material and specifically inquired about what entity would perform the work. In its revised proposal, intervenor stated:

We intend to enlist Terrell Materials Corporation to both batch the CLSM as well as to haul the material to the point of placement. The batching will be done via a portable central mix batch plant as described in this section of the proposal. Terrell Materials is a DBE with a successful 15 year track record  in the concrete batching industry. **The Forgen/Odin JV will self-perform the placement of CLSM as described in detail in Section 3.5.2 below with our own self-perform resources.**

(capitalization and emphasis in original).

After the evaluations of the revised proposals, the Source Selection Authority determined Forgen-Odin JV's revised proposal "in the amount of $492,335,680.00 (base

_____

[14] Protestor's counsel also suggested that Terrell was a major sub-contractor "under the definition, because they're involved in the process of the placement of the CLSM, because without the batching, without the transport, you're not placing any CLSM."

and options) represents the best value to the Government, based on my assessment and comparison of the offerors' technical merit, past performance, small business participation, and proposed prices." As discussed above, the Source Selection Authority's summary of Forgen-Odin JV's revised proposal evaluation in the Source Selection Decision Document stated, in part:

**FACTOR 1 – TECHNICAL MERIT**

Strengths:

The initial proposal strengths remained unchanged after an evaluation of the revised proposal. The write-up provided by the offeror indicates an exceptional approach and understanding of the requirements in the strengths provided. The information provided in the above strengths shows the risk of unsuccessful performance is low.

Weaknesses:

**The offeror resolved all weaknesses.**

- No major sub-contractor is identified for the work effort of surface and subsurface water management. Since no major sub-contractor is identified, it appears that the work will be self-performed, but there is no clear statement of offeror's intent to self-perform this feature of work (Letter of Commitment requirement stated in Factor 1). **This weakness was resolved in Section 5.1 on page 41 of the revised Volume 1, Factor 1 proposal to show self-performance.**
- Major sub-contractor Terrell Materials Corporation provides the batch plant and materials to produce the CLSM material, but the proposal does not state whether placement of CLSM will be self-performed or whether placement of CLSM will be completed by a major subcontractor (Letter of Commitment requirement stated in Factor 1). **This weakness was resolved in Section 3.5.1 on page 32 of the revised Volume 1, Factor 1 proposal to show self-performance.**

(capitalization and emphasis in original).

In its reply brief, protestor argues: "Rather than indicating that Terrell would be a major subcontractor only if it were placing CLSM, the Agency's evaluation confirms that Terrell is a major subcontractor even if it is only manufacturing the CLSM." The evaluation documents quoted above do not support protestor's reading of the agency's evaluation regarding the Controlled Low Strength Material. The agency, in evaluating intervenor's initial proposal, was primarily concerned about the placement of the Controlled Low Strength Material, after Terrell was identified as batching and transporting the Controlled Low Strength Material, and considered the weakness resolved once Forgen-Odin JV represented that it would self-perform the placement of the Controlled Low Strength Material, and not Terrell.

As discussed above, the RFP required that

> a letter of commitment must be provided as established under "Construction Sequence and Turnover Plan" for any proposed major subcontractor for the following: cutoff wall construction, surface and subsurface water management, <u>placement</u> of Controlled Low Strength Material (CLSM), and blasting. If any of that work is intended to be self performed, it should be stated in the proposal.

(emphasis added).

The court finds that, consistent with the RFP, the placement of the Controlled Low Strength Material triggered the requirement for a letter of commitment from a major subcontractor. As intervenor represented in its revised proposal that it would self-perform the placement of the Controlled Low Strength Material, a commitment letter from Terrell was not necessary to be included in the intervenor's revised proposal, and, was not necessary to the resolution of the weakness earlier assigned by the agency for the completion of the Controlled Low Strength Material requirement when it received the intervenor's initial proposal. Nor was a commitment letter from Terrell necessary for the agency to fully evaluate intervenor's revised proposal. The court does not agree with protestor's position that batching and transporting the Controlled Low Strength Material was an element of the placement of Controlled Low Strength Material process, and, therefore, part of the work required by the RFP to be performed by a major subcontractor or self-performed. Consequently, the court finds that the agency did not act improperly when it resolved the Controlled Low Strength Material weakness identified by the agency regarding intervenor's initial proposal. As identified above, the agency determined that "**[t]his weakness [regarding the placement of Controlled Low Strength Material] was resolved in Section 3.5.1 on page 32 of the revised Volume 1, Factor 1 proposal to show self-performance.**" (emphasis in original; alterations added). Therefore, determination of whether Terrell's commitment letter having been addressed to "Odin Construction, LLC" should have resulted in the elimination of intervenor's revised proposal from consideration by the agency, or if the agency had the ability to overlook the misidentified commitment letter is not necessary to find the agency properly evaluated Factor 1 – Technical Merit when reviewing intervenor's revised proposal as it related to the placement of the Controlled Low Strength Material.

The court notes that resolving this issues regarding placement of the Controlled Low Strength Material, however, was made more challenging by the agency because the agency initially confused the matter in its August 12, 2022 discussions letter by identifying Terrell as a "Major sub-contractor," stating "Major sub-contractor Terrell Materials Corporation provides the batch plant and materials to produce the CLSM material, but the proposal does not state whether placement of CLSM will be self-performed or whether placement of CLSM will be completed by a major subcontractor." The Source Selection Decision Document, after receiving the revised proposals, also referred to Terrell as a "Major sub-contractor" when addressing the placement of Controlled Low Strength Material:

Major sub-contractor Terrell Materials Corporation provides the batch plant and materials to produce the CLSM material, but the proposal does not state whether placement of CLSM will be self-performed or whether placement of CLSM will be completed by a major subcontractor (Letter of Commitment requirement stated in Factor 1). **This weakness was resolved in Section 3.5.1 on page 32 of the revised Volume 1, Factor 1 proposal to show self-performance.**

(emphasis in original). Although the agency ultimately explained that the issues had been resolved by Forgen-Odin JV, it would have been better practice for the agency to have more fully addressed why the weakness was resolved by intervenor's decision to self-perform the placement of the Controlled Low Strength Material, and why that affirmation by the intervenor negated the need for Terrell's commitment letter. Moreover, by using more precise language, the agency could have avoided confusion by not referring to Terrell as a major sub-contractor in evaluating Forgen-Odin JV's revised proposal at any point.

Intervenor added to the confusion by incorrectly representing Forgen-Odin JV consists of Forgen, LLC and Odin Construction Solutions, Inc. in both intervenor's initial proposal and in intervenor's revised proposal to the agency. Additionally, the court recognizes that intervenor further complicated the Terrell commitment letter issues by including the commitment letter from Terrell in the first instance. If, as intervenor argues, "Forgen was not required to submit a letter of commitment from Terrell Materials," intervenor did not need to submit the Terrell commitment letter in its revised proposal. Furthermore, to clear up any confusion after representing that intervenor would self-perform the placement of the Controlled Low Strength Material, intervenor could have removed the Terrell commitment letter from the revised proposal submitted to the agency.

The court further notes that the United States Court of Appeals for the Federal Circuit reminded that: "We have stated that procurement decisions 'invoke [ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 (alteration in original) (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))). In the current protest, the court finds it was not arbitrary or capricious, pursuant to the Controlled Low Strength Material requirement, for the agency to accept the intervenor's representation in its revised proposal that intervenor would self-perform the placement of the Controlled Low Strength Material and for the agency to resolve the intervenor's previously identified weakness for the Factor 1 – Technical Merit which had been present in intervenor's initial proposal related to the placement of the Controlled Low Strength Material. See id.

Revised Construction Schedule

As detailed above in the findings of fact section of this Opinion, the RFP explained offerors were required to submit a "Construction Sequence and Turnover Plan" and

"Construction Schedule" for Factor 1 – Technical Merit. For the "Construction Sequence and Turnover Plan," the RFP stated:

> In a narrative format, the offeror must describe in detail the proposed Construction Sequence and Turnover Plan regarding how the offeror intends to approach, sequence, and execute the work from start to completion. The plan must include a description of related activities and include coordination with major subcontractors, types of equipment to be utilized and any other means and methods the offeror feels will give the Government confidence the offeror understands and will successfully complete the project.

> At a minimum the Construction Sequence and Turnover Plan must:

> 1. Outline and illustrate the approach, sequence, and timing of activities that represent work through the entire project from mobilization to demobilization, to include the means and methods for turning over sections (Inclusive of Preliminary Foundation Preparation, Rock Foundation and Geologic Mapping, Final Foundation Preparation, Controlled Low Strength Material (CLSM), CLSM Top Cover, and Cutoff Wall (including Verification Drilling/Testing)) of completed foundation that can be removed from the construction footprint and turned over to the Government in no less than 500-foot segments that meet requirements of sections 01 45 08 and 01 78 02 of the solicitation.

> 2. Provide a list of equipment (type, model number, and quantity) planned to be utilized to prepare the dam foundation and construct the cutoff wall as specified in sections 02 35 29, 31 23 24, and 31 66 10 of the solicitation.

> 3. Include a conceptual/draft Rock Foundation Preparation Plan as specified in Section 31 66 10 of the solicitation.

> 4. Provide discussion of the means and methods of cutoff wall construction and trench excavation through rock, as well as the means and methods of cutoff wall backfill preparation, transport, placement, and slurry management as specified in section 02 35 29.

> 5. Provide a concept/draft of the proposed plan to manage surface and subsurface water within the limits of construction and/or off-site to include a description of all necessary permits as specified in section 01 57 20 and following all requirements specified in section 31 52 10 of the solicitation.

> 6. Explain in detail how the offeror will manage access to the site, stockpile areas, and traffic within project access and haul roads to allow for construction and unobstructed access throughout the duration of the project. Include detail for coordination and cooperation with other contractors working near the limits of construction.

> 7. Provide a detailed explanation of how the offeror will ensure quality control including a description of proposed quality control measures such

59

as materials testing, data management, material management, surveying, etc., as required in section 01 45 04 and section 01 45 08 of the solicitation.

The RFP also stated:

Additional consideration may be given for the Construction Sequence and Turnover Plan that:

8. Describes in detail the external influences on the construction area with respect to items such as groundwater elevation, dewatering, effluent discharge.

9. Includes the work production rate(s) anticipated to maintain the construction schedule, and the means for monitoring the production rate(s).

10. Provides a list of owned or leased construction equipment, the equipment location in relation to the project site, and the equipment(s) availability for use from 2022 through 2027.

11. Coordinates the routing of surface water and subsurface water effluent through on-site canals extending through farms outside the construction limits with local interests (farmers) if off-site discharge is contemplated to be necessary for management of surface and subsurface water.

12. Identifies if cofferdams are proposed, their location, as well as a conceptual design.

13. Identifies intended stockpile areas within the construction limits, to include the material intended to be stockpiled in a specific location.

14. Identifies location of haul roads within the construction limits.

15. Provides estimation of and details related to earthwork cut/fill balances taking into consideration processing rock into satisfactory fill.

16. Provides details for establishing on-site batch plant(s), to include their location within the construction limits, material intended to produce, and daily output anticipated.

17. Provides details related to mobile or stationary equipment necessary for rock crushing and/or processing of excavated material, to include their location within the construction limits, material they're capable of producing, and daily output anticipated.

18. Includes a conceptual/draft Data Management Plan as specified in section 01 45 08 of the solicitation.

19. Includes a conceptual/draft CLSM work plan as specified in section 31 23 24.

20. Includes a conceptual/draft Cutoff Wall construction plan as specified in section 02 35 29.

21. Includes a conceptual/draft CQC Plan as specified in section 01 45 04.

22. Includes a conceptual/draft master blasting plan as specified in section 31 23 16.

For the Construction Schedule, the RFP stated offerors must:

Provide a schedule of construction within the period of performance provided in Section 00700, FAR Clause 52.211-10, in the formant [sic] of a Gantt, Pert, or similar graphical timeline, showing the start and completion dates, interdependence, and other relative scheduling factors for all the items of work contained within the proposed Construction Sequence and Turnover Plan.

At a minimum, the construction schedule must show the interdependence of activities (i.e., schedule logic) and start and completion dates for the following:

1. Mobilization and Demobilization of all work items

2. Critical path activities

3. Clearing and grubbing within the construction footprint (including staging, stockpiling, and borrow areas where required)

4. Surface and Subsurface Water Management system(s)

5. Rock Foundation preparation demonstration section

6. Rock Foundation preparation

    a. Preliminary Foundation Preparation (including de-mucking/removal of overburden)

    b. Rock Foundation Inspection and Mapping

    c. Final Foundation Preparation

    d. CLSM Dental Treatment

7. Cutoff Wall demonstration section

8. Cutoff Wall construction, to include pretreatment of rock

9. Submittals and Permits

10. Contingency time (e.g., float)

11. Start and End of Project activities

(alteration added).

As described above, the RFP further stated that the failure to submit any of the minimum requirements for the Construction Sequence and Turnover Plan or for the Construction Schedule will be noted as a deficiency, and failure to provide "clear and

comprehensive detail to any of the minimum requirements" for the Construction Sequence and Turnover Plan or for the Construction Schedule "may be noted as a significant weakness or weakness." Under the heading "**Evaluation Method**," (emphasis in original), the RFP explained:

> The Government will evaluate the Construction Sequence and Turnover Plan, and the Construction Schedule to determine the degree to which the offeror's proposal meets the requirements of the solicitation as well as the feasibility of the proposed approach. The feasibility of the proposed Construction Sequence and Turnover Plan and Construction Schedule will measure how well the means and methods proposed provide the Government with confidence of the offerors understanding of the project and potential for successful project completion in accordance with the solicitation requirements and within the required contract schedule. The Construction Schedule must be corroborated by the Construction Sequence and Turnover Plan.

> The Construction Sequence and Turnover Plan evaluation determines the level of understanding of how the offeror intends to approach, sequence, and execute the work from start to completion. Narratives that demonstrate a clear understanding and provide a thorough approach for successfully managing the solicited project that gives the government a higher level of confidence may be rated more favorably by the Government.

> The Construction Schedule evaluation determines the degree to which the offeror's proposal meets the requirements of the solicitation as well as the feasibility of the proposed approach. The offeror's schedule narrative should be expressed in calendar days, not dates.

> The evaluation will include whether the offeror has demonstrated a reasonable understanding of the Construction Schedule. A Construction Schedule shorter than the contract duration of 2044 calendar days indicates the offeror is placing additional risk on the Government for any delays between the scheduled completion date and the required contract completion period. The Government will consider a condensed contract duration, which places additional cost or schedule risk on the Government, or which may create a risk of contract or performance failure as "unacceptable".

In the August 12, 2022 discussions letter with Forgen-Odin JV, Source Selection Authority and Contracting Officer Tracy noted the agency identified a deficiency regarding the Construction Schedule in the intervenor's initial proposal:

> • The proposal failed to meet the construction schedule duration of 2044 calendar days. The schedule provided is 2010 calendar days. The solicitation stated that a Construction Schedule duration shorter than the contract duration of 2044 calendar days indicates the offeror is placing additional risk on the Government for any delays between the scheduled completion date and the required contract completion

> period. The Government will consider a condensed contract duration, which places additional cost or schedule risk on the Government, or which may create a risk of contract or performance failure as "unacceptable". Information is contained in the construction schedule starting on page 231 of Volume 1, Factor 1.

Forgen-Odin JV responded to the discussions letter it received and explained that for the Construction Schedule: "We adjusted the number of calendar days between NTP 1 and Final Completion to be equal to 2,044 calendar days." The revised Construction Schedule included in Forgen-Odin JV's revised proposal lists the "First Notice to Proceed" as November 2, 2022 and lists the "Final Completion" to end on June 7, 2028, equaling 2,044 calendar days.

Regarding Forgen-Odin JV's revised Construction Schedule, Thalle alleges in its bid protest complaint, the "USACE ignored FOJV's failure to meet the required duration," requirement in the RFP, arguing: "Although the RFP required offerors to submit a proposed contract schedule no shorter than 2044 calendar days, FOJV's original schedule did not meet the minimum duration," and "Section 1.1 on page 14 of FOJV's revised proposal shows a start date of January 11, 2023 and a project closeout date of June 7, 2028, for a duration of 1,974 calendar days." (internal references omitted). Therefore, protestor argued, "[t]he RFP required USACE to deem such a revision to the schedule unacceptable. On this basis alone USACE therefore should have assessed a Deficiency against FOJV's proposal and an adjectival rating of Unacceptable for Factor 1, which would have excluded FOJV's proposal from consideration for award." (internal reference omitted; alteration added).

In its motion for judgment on the Administrative Record, Thalle reiterates:

> Forgen-Odin's proposed schedule fell short of the minimum duration of 2,044 days. While the Corps initially recognized that defect in Forgen-Odin's proposal with a Deficiency finding, by its final evaluation, the Corps identified no issues with the schedule. The Corps asserted that Forgen-Odin fixed the deficiency with its revisions to a single page of its proposal, stating: "This deficiency was resolved with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal." The Corps made no mention of any other sections of Forgen-Odin's proposal in relation to this defect. But the Corps' findings contradict the proposal. The schedule on page 14 of Forgen-Odin's proposal undeniably includes only 1,974 calendar days.

(internal references omitted).[15] Protestor also claims:

---

[15] Similar to the court's observation regarding the placement of the Controlled Low Strength Material analysis, in its filings regarding intervenor's construction schedule, protestor does not always specify to which of intervenor's proposals protestor is referencing, nor does protestor address the difference between the intervenor's initial proposal and the intervenor's revised proposal. As explained above, only the revised proposal is properly before the court.

The difference between the earliest start date and the last finish date of Forgen-Odin's original schedule (1/11/2023 through 5/3/2028, *i.e.*, 1,939 days) and its new schedule (1/11/2023 through 6/7/2028, *i.e.*, 1,974 days) conclusively demonstrates that no activity dates can change the fact that Forgen-Odin's new schedule still did not reach the minimum duration of 2,044 days set out in the RFP.

(emphasis in original; internal references omitted).

In response, intervenor states:

Thalle alleges that Forgen's proposed schedule warranted a Deficiency because it included a period of performance less than the required 2,044 days, but those allegations are directly refuted by the terms of Forgen's proposal.

Thalle's arguments regarding Forgen's proposed duration are premised entirely on citations to an incorrect and inapplicable portion of Forgen's proposal. Specifically, Thalle cites a portion of Forgen's proposal that addressed the Construction Sequence and Turnover Plan, rather than the Construction Schedule. In reality, Forgen's Construction Schedule is located on pages 232-268 of Forgen's revised proposal.

Upon review of the relevant portion of Forgen's proposal, it is clear that Forgen's Construction Schedule reflects a period of performance of 2,044 days, beginning on November 2, 2022, and concluding on June 7, 2028. While that information is sufficient in itself to defeat Thalle's misguided arguments, Forgen's proposal contains additional language to further clarify the proposed period of performance, stating: "Collectively this schedule incorporates the following changes and/or clarifications: . . . We adjusted the number of calendar days between NTP 1 and Final Completion to be equal to 2,044 calendar days." Thus, there is no reasonable argument that Forgen proposed a period of performance less than 2,044 days, and Thalle's argument should be rejected in its entirety.

(internal references omitted; omission in intervenor's brief).

Defendant argues Forgen-Odin JV "stated explicitly in its revised construction schedule proposal: 'We adjusted the number of calendar days between [Notice to Proceed 1] and Final Completion *to be equal to 2,044 calendar days*.'" (emphasis and alteration in defendant's brief). Defendant continues: "Forgen's revised proposal thus makes clear that Forgen affirmatively fixed the schedule deficiency and met the requirements of the solicitation." Defendant emphasizes that

Thalle's argument thus fails because Forgen's construction schedule is found on pages 232-268 of its revised proposal. That schedule reflects the correct number of days—2,044. Specifically, the schedule lists activity A1070 as the "First Notice to Proceed" to be issued on November 2, 2022. Activity A7330 is then listed as "Final Completion" and scheduled for June 7, 2028. A schedule calculation for these dates equals 2,044 days. Moreover, the smaller figure that Thalle cites does not include award and pre-construction activity.

(internal references omitted). At the oral argument, when asked by the court if it was possible that there was still a mistake with the construction schedule in the intervenor's revised proposal, defendant's counsel of record stated that "the construction schedule portion of their proposal that was required to be 2,044 days, in fact, is 2,044 days." Additionally, in response to a question from the court: "So what you're basically saying, not even necessary, I think, to go through each of the steps of the construction schedule, you're saying that it's 2,044 days, not in dispute," defendant's counsel replied: "No, Your Honor."

After review of intervenor's revised construction schedule proposal, the court agrees with intervenor and defendant that the dates in the revised Construction Schedule equal 2,044 days. The summary in intervenor's revised proposal before the construction schedule provides:

The Forgen/Odin JV appreciates the opportunity to submit a revised Construction Schedule in response to the letter received from the Government on August 12, 2022 and our subsequent discussion on August 16, 2022. This schedule incorporates the feedback we received during the discussion as well as addresses the weaknesses and deficiencies identified in the letter.

As noted in both the intervenor's filings and the defendant's filings, the revised proposal specifically indicated: "We adjusted the number  of calendar days between NTP 1 and Final Completion to be equal to 2,044 calendar days." The revised construction schedule proposal, with great specificity, identifies each step of the process and methodically tracks the number of days the project will take to complete. The complete schedule is located on pages 232-268 of intervenor's revised proposal, with the specific timeline included on pages 234-252 of the proposal. After careful review of the intervenor's revised construction schedule proposal, the court concludes that the revised Construction Schedule reflects 2,044 days as required by the RFP.

In its reply brief, and at the oral argument, protestor argues, notwithstanding the correct number of days in the revised construction schedule, the agency's evaluation of intervenor's revised construction schedule demonstrated a lack of attention to detail. At the oral argument, protestor's counsel stated: "I'm not going to argue whether this [the 2,044 days included in the revised Construction Schedule] was correct or incorrect, but the point remains that this was really sloppy work." (alteration added). Protestor

explained at the oral argument, "when the agency went back to evaluate it [the revised Construction Schedule], what it said was, and this is all that the agency said, was the deficiency was resolved with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1." (alteration added).

As identified by protestor in its motion for judgment on the Administrative Record:

The Corps asserted that Forgen-Odin fixed the deficiency with its revisions to a single page of its proposal, stating: "This deficiency was resolved with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal." The Corps made no mention of any other sections of Forgen-Odin's proposal in relation to this defect.

(internal reference omitted). In the evaluation of intervenor's revised proposal, the Source Selection Decision Document stated regarding the deficiencies identified earlier in intervenor's initial proposal:

**The offeror resolved all deficiencies.**

- The offeror failed to meet the construction schedule duration of 2044 calendar days. The schedule provided is 2010 calendar days. The solicitation stated that a Construction Schedule duration shorter than the contract duration of 2044 calendar days indicates the offeror is placing additional risk on the Government for any delays between the scheduled completion date and the required contract completion period. The Government will consider a condensed contract duration, which places additional cost or schedule risk on the Government, or which may create a risk of contract or performance failure as "unacceptable". Information is contained in the construction schedule starting on page 231 of Volume One (4th Paragraph under Evaluation Method of Construction Schedule indicates that a Construction Schedule duration shorter than the contract duration of 2044 days will be [sic] result in an overall rating of "unacceptable"). **This deficiency was resolved with new schedule provided in Section 1.1 on page 14 of the revised Volume 1, Factor 1 proposal.**

(alteration added).

The page cited by the Army Corps of Engineers, page 14 of Forgen-Odin JV's revised Volume 1, Factor 1 proposal, contains "Figure 1.1. Sequence and Timing of Operations" which lists "**Mobilization / Project Initiation**" and "Project Initiation Activities" starting on January 11, 2023 and "**Project Closeout**" for "All Activities" finishing on June, 7 2028, totaling 1,974 calendar days. (emphasis in original).

Protestor, in its reply brief argues that

inattention permeates the schedule analysis. The Corps initially found that Forgen-Odin's schedule did not meet the minimum duration of 2,044 days. When Forgen-Odin purported to correct the Deficiency, the Agency cited page 14 of Forgen-Odin's final proposal revision as proof that Forgen-Odin had made the necessary correction. But page 14 of Forgen-Odin's proposal shows a schedule that falls well short of the minimum duration, making it a nonresponsive proposal per the express Solicitation requirements. The Agency now argues that "the Corps may have contributed to confusion on this issue by citing page 14 of the revised proposal in finding that the deficiency had been resolved." But this is not confusion on Thalle's part – it was the Corps, not Thalle, that cited a portion of Forgen-Odin 's proposal that does not show the Deficiency had been corrected. It is the Agency's duty to sufficiently document the basis of its evaluation and award decision, and it failed to do so here. Again, its inattention to detail and to its obligations resulted in an improper award to Forgen-Odin.

(internal references omitted).

Defendant, in its filings, stated:

We concede that the Corps may have contributed to confusion on this issue by citing page 14 of the revised proposal in finding that the deficiency had been resolved. Indeed, this is the apparent basis of Thalle's continuing assertion that Forgen submitted a deficient construction schedule. But the agency's clerical error does not change the record. As we showed above, Forgen affirmatively recognized the deficiency that the Corps highlighted and fixed it.

(footnote and internal reference omitted). Defendant's counsel also provided additional context regarding this reference at the oral argument, stating:

What the COR did here in this evaluation document is not that they cited the wrong number, they cited the wrong page. When they said Forgen has resolved this, which Forgen objectively did, right, that's why we get back to the 100 percent. And this kind of relates what I was calling a timeline, that was probably too fancy a word for what I was saying.

The COR initially went to Forgen in its deficiency letter and said, your construction schedule, which is a specific part of the proposal, starting on page 231, is wrong. It doesn't meet the minimum 2,044-day requirement. Fix that. They literally said starting not at page 14, but your construction schedule starting on page 231 is wrong.

Defendant's counsel continued:

So that's the part of the proposal that the agency was pointing to when they said there was something wrong. They weren't pointing to page 14, they weren't pointing to the construction sequence and timing table, they were pointing to the Construction Schedule, capital C, capital S.

Forgen then came back and fixed the construction schedule to be equal to 2,044 days.

Defendant's counsel elaborated:

When the agency said fix page 231 of your proposal, they then did. They went and fixed it. The agency came back and said, this is resolved. But they cited the wrong page. And I say "wrong" in quotation marks. I'm not going to get there quite yet, but it's not really that wrong. I mean, what was on page 14 is also consistent with what was fixed about Forgen's proposal. But the agency correctly said it was resolved, accurately correctly said it was resolved. They just cited the wrong -- they cited the wrong page.

Defendant's counsel concluded by explaining at oral argument:

So there are a couple of things going on there. First of all, the agency is clearly recognizing that it was the construction schedule and not the construction sequence and turnover plan that the -- that Forgen had fixed. Forgen-Odin Joint Venture had fixed.

And second, they're clearly distinguishing and comparing those two very different parts of the proposal. They're saying that they fixed the construction schedule and they're distinguishing that from this construction sequence and turnover plan, which is at page 14.

Intervenor notes in its reply brief that in addition to the Source Selection Evaluation Board's confusing reference to page 14 of intervenor's revised proposal,

the SSAC Report states:

Specifically, [Forgen's] final revised proposal, which presented an exceptionally well-developed Construction Sequence and Turnover Plan, contains 13 strengths and zero weaknesses or deficiencies, while the Construction Schedule, which indicates the firm is able to complete the work within 2,044 calendar days from receipt of the Notice to Proceed, as required by the solicitation, is logical, detailed and correlates well with the proposed Construction Sequence and Turnover Plan.

(alteration in original).

68

The court agrees with protestor that some of the words chosen by the agency in its evaluation of intervenor's revised Construction Schedule was not a model of clarity. As noted above with regard to the Terrell commitment letter issue, the agency's evaluation could have been more precise. The same is true regarding the evaluation of the intervenor's revised Construction Schedule. The agency should have more carefully described its evaluation of the intervenor's revised Construction Schedule. Best practice by the agency would have been to offer a more complete explanation, which would have avoided the agency merely referring to a page number of the intervenor's revised proposal, and could have more completely documented the 2,044 days of the revised Construction Schedule submitted in intervenor's revised proposal. The court notes, however, that the agency's Source Selection Advisory Council Comparative Analysis Report did indicate the agency considered the duration of intervenor's revised Construction Schedule in its evaluation. The Source Selection Advisory Council Report stated in part, "the Construction Schedule, which indicates the firm is able to complete the work within 2,044 calendar days from receipt of the Notice to Proceed, as required by the solicitation, is logical, detailed and correlates well with the proposed Construction Sequence and Turnover Plan." Although lacking more detail, the Source Selection Advisory Council Report demonstrates that the agency evaluated the intervenor's Construction Schedule in its revised proposal pursuant to the provisions of the RFP to determine Forgen-Odin JV met the required Construction Schedule duration for Factor 1 – Technical Merit even though the agency cited to page 14 of intervenor's revised proposal in another part of its evaluation. Despite the foregoing, the "sloppiness" alleged by protestor is insufficient to find the agency's evaluation and award to the intervenor was arbitrary or capricious. As noted above:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351. Given the deference to the agency in the above captioned protest that, after evaluation, the intervenor's revised proposal met the requirements of the RFP, and as discussed and determined above, that the revised Construction Schedule was for the correct number of days in intervenor's revised proposal, the court does not find that the evaluation of the intervenor's revised Construction Schedule was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Per Aarsleff A/S v. United States, 829 F.3d at 1309 (internal references omitted). Although the analysis was not as robust as it could have been and the agency's documentation was not perfect, the agency was not incorrect to identify, and accept, the corrected revised Construction Schedule from intervenor in its revised proposal. As determined above, the agency also reached a rational determination to accept the intervenor's representation in its revised proposal that it would self-perform the

placement of the Controlled Low Strength Material and for agency to remove the weakness for the Factor 1 – Technical Merit related to the placement of the Controlled Low Strength Material. See, e.g., Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332.

## CONCLUSION

For the foregoing reasons, as also indicated in the earlier oral decision issued to the parties, it was not arbitrary and capricious for the agency to find intervenor's revised proposal awardable. Protestor's motion for judgment on the Administrative Record is **DENIED**. Defendant's and intervenor's cross-motions for judgment on the Administrative Record are **GRANTED**. Protestor's complaint is **DISMISSED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

## IT IS SO ORDERED.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**